IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

07 MAR 29 PM 1:45

OFFICE OF THE CLERK

| | |
|---|---|
| ELIZABETH M., SELENA T.; JENNIFER H.; JULIANA W.; PENNY G.; ETHEL H.; MARY W.; ROBIN H.; THERESA L-R SARA M.; TAMICA S., by and through her legal guardian, SHAUNDA STARKS; KIMBERLY H.; PAM B.; CAROLINE C., by and through her legal guardian, THEDA CARTER; JOELENE B.; and SUSAN Z., by and through her legal guardian, JUDITH WIDENER, on behalf of themselves, <br><br>        Plaintiffs, <br><br> vs. <br><br> CHRISTINE PETERSON in her official capacity as the Chief Administrative Officer of Nebraska Health and Human Services System; WILLIAM GIBSON, in his official capacity as the Chief Executive Officer of the Lincoln Regional Center, the Hastings Regional Center, and the Norfolk Regional Center; <br>        Defendants. | Case No. 8:02CV585 <br><br><br><br><br><br> **SETTLEMENT AGREEMENT** |

## I.

## INTRODUCTION

This action was filed on December 13, 2002, in the State of Nebraska, United States District Court for the District of Nebraska, on behalf of the named Plaintiffs.

The Parties have negotiated this agreement, subject to approval by the Court. The settlement has been negotiated to avoid the delay, expense, and uncertainty of further litigation.

## II.

## PURPOSE

The purpose of this Settlement Agreement is to enforce and secure to the plaintiffs constitutional and statutory rights, hereby acknowledged and recognized by the Parties, and

- 1 -

which arise and are secured under the United States Constitution, Nebraska Constitution, Federal statutes, Nebraska statutes, and implementing regulations, to wit:

A.     The maintenance of a safe, violence-free, therapeutic environment while the plaintiffs are in the care and custody of Nebraska Health and Human Services System (NHHSS) at the Lincoln Regional Center (LRC);

B.     The implementation and continuation of appropriate trauma informed and trauma specific individualized mental health treatment for the plaintiffs while they are in the care and custody of NHHSS at the LRC which shall include, but not be limited to:

1.     Psychiatric rehabilitation/self-empowerment programs;

2.     Trauma informed and trauma specific treatment programs, individualized within the treatment plans for the plaintiffs, which identify, assess, and treat trauma and its impact on mental health for patients presenting histories of sexual and physical abuse, incest, or rape.

C.     The continuation and enforcement of policies and procedures assisting plaintiffs in their exercise of protected rights to a safe therapeutic environment and appropriate trauma informed and trauma specific mental health treatment.

D.     The parties recognize and acknowledge that many of the programs, policies, and procedures necessary to enforce and secure the above-referenced rights are currently in place and are being utilized by the NHHSS at the LRC.

E.     Nothing in this Settlement Agreement shall be construed as the assumption or creation of any new legal duty not already imposed under current law arising from the United States Constitution, Nebraska Constitution, Federal statutes, Nebraska statutes, and implementing regulations, so as to create any new cause of action not already available to

plaintiffs. Nothing in this Settlement Agreement shall be construed as a waiver of any state court claim or defense.

## III.

## DEFINITIONS

For purposes of this Settlement Agreement, unless specifically noted, relevant definitions will be drawn from the Joint Commission on Accreditation of Health Care Organizations (JCAHO), which is recognized as one of the accreditation bodies of hospitals, or by the relevant statutes and laws of the State of Nebraska. Defendants shall continue to adhere to the JCAHO and Centers for Medicare and Medicaid Services (CMS) standards and all other relevant laws, statutes, and policies.

A.      "Consultation" means the act or procedure of consulting; a conference at which advice is given or views are exchanged by telephone, video, e-mail or in person.

B.      "Discharge Plan" means appropriate follow-up care necessary to meet the plaintiffs' individualized needs and identifies the aftercare provider(s) upon discharge or release from the LRC operated by NHHSS. An appropriate discharge plan will include the client's history of trauma and must be developed in consultation with the client.

C.      "Evidenced Based Treatments" are those mental health treatments meeting the following criteria, to wit: (1) manualized treatment, (2) with some demonstrated efficacy, and (3) published in a peer reviewed journal.

D.      "Individualized Treatment Plan" means a plan which (a) clearly and comprehensively identifies the mental illness and/or substance dependence of the person, (b) identifies and implements a comprehensive program of services, including Survivor Consumer Driven Services and Trauma Based Treatment Programs consistent with the individualized needs

- 3 -

of the person, designed and structured to meet the particular needs of the person, and (c) comprehensively identifies reasonably attainable short-term and long-term treatment goals for the person and identifies a reasonable project timetable for the attainment of such goals.

E.     "Medication and Symptom Management Modules" are a means to maximize appropriate implementation of a trauma informed drug regimen, the development of which a resident participates, and which consists of four skill areas: (a) identifying the benefits of antipsychotic medication, (b) learning reliable self-administration, (c) identifying and coping with side effects, and (d) negotiating changes in medication with health care providers.

F.     "NHHSS" means the Nebraska Health and Human Services System, and any successor agency established by the State of Nebraska to provide behavioral health treatment on an inpatient basis within the State of Nebraska during the effective term of this Settlement Agreement and any extension thereof.

G.     "One-to-one (1:1)" means supervision of a plaintiff by trauma-informed staff, either directly or by video monitoring.

H.     "Plaintiffs" refers collectively to all persons listed as Plaintiffs in the caption of this lawsuit and not previously dismissed from the lawsuit by the Court, including guardians and Nebraska Advocacy Services, Inc. ("NAS"), as the legal representative of the plaintiffs and the designated Protection and Advocacy Agency under the Protection and Advocacy for Individuals with Mental Illness Act ("the PAIMI Act"), 42 U.S.C. § 10801 et seq., and its implementing regulations at 42 C.F.R. Part 51; and the Protection and Advocacy for Individual Rights Act ('the PAIR Act"), 29 U.S.C. § 794e and its implementing regulations at 34 C.F.R. Part 381.

I.     "Post-Traumatic Stress Disorder" (PTSD) is the presence of intense fear, or helplessness, or horror (in children, this may be expressed by disorganized or agitated behavior)

- 4 -

which arises from exposure to trauma (the experience of an uncontrollable event perceived to threaten a person's sense of integrity or survival, one involving both: 1) direct threat of death, severe bodily harm, or psychological injury or a threat to the physical integrity of self or other; and 2) the person's response at the time involves fear, helplessness or horror or, in children, disorganized or agitated behavior), and which manifests in characteristic symptoms, which last for more than one (1) month, including persistent re-experiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness, and persistent symptoms of increased arousal, and where said symptoms cause clinically significant distress or impairment in social, occupation, or other important areas of functioning.

J.      "Professional Judgment" is a decision by a qualified professional that is not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such accepted professional judgment.

K.      "Psychiatric Rehabilitation/Self Empowerment Programs" (PREP) means trauma informed services aimed to improve the long-term capabilities of plaintiff/women with psychiatric disabilities for living, learning, and working in a least restrictive environment consistent with the individual treatment needs of individuals, and for promotion of socializing and adapting skills of plaintiffs in as normalized a fashion as possible.

L.      "Recovery" refers to a multidimensional process with elements common to the lives of those individuals with experiences of trauma; those who have been diagnosed with, and received services related to diagnoses of, mental disorders; and those who have substance use problems. These common elements include empowerment; healing and transformation; meaning

- 5 -

and purpose; citizenship and belonging and the capacity to adopt chosen relationships and in the community as a whole.

  M. "Restraint" means:

    1. Any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a resident to move his or her arms, legs, body, or head freely; or

    2. Any drug or medication when it is used as a restriction to manage the resident's behavior or restrict the resident's freedom of movement and is not a standard treatment or dosage for the resident's condition.

    3. Restraint does not include devices, such as orthopaedically prescribed devices, surgical dressings or bandages, protective helmets, or other methods that involve the physical holding of a resident for the purpose of conducting routine physical examinations or tests, or to protect the resident from falling out of bed, or to permit the resident to participate in activities without the risk of physical harm (this does not include a physical escort).

  Restraint may only be used for the management of violent or self-destructive behavior. All residents have the right to be free from restraint, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff.  Restraint may only be imposed to ensure the immediate physical safety of the resident, a staff member, or others, and must be discontinued at the earliest possible time.

  N. "Re-traumatization" is any event that triggers intense trauma-related responses in the experience of a person previously exposed to a traumatic event.  A re-traumatizing event is one which in some way replicates the dynamics of the original trauma.

O.      "Seclusion" means the involuntary confinement of a person alone in a room or area from which the person is physically prevented from leaving. Seclusion may only be used for the management of violent or self-destructive behavior. All residents have the right to be free from seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. Seclusion may only be imposed to ensure the immediate physical safety of the resident, a staff member, or others, and must be discontinued at the earliest possible time.

P.      "Substantial Compliance" means when a party has taken all reasonable steps within its power to comply. The determination of whether substantial compliance has been achieved will depend upon the language of the provision in the agreement at issue and the circumstances of the alleged noncompliance, including the nature of the interest at stake and the degree to which the alleged noncompliance affects that interest.

Q.      "Survivor/Consumer" means individuals, specifically including applicable plaintiffs, who have lived experiences of trauma and who also use mental health, substance abuse, and/or other human services.

R.      "Survivor/Consumer-Driven Services" means services that are organized in response to the needs, preferences, and priorities of survivor/consumers who are thoroughly and centrally involved in planning, implementation, and delivery of services.

S.      "Trauma" means a range of horrific, terrifying events that disrupt an individual's life in fundamental ways.

T.      "Trauma Based Treatment Programs" are the trauma specific and trauma informed treatment modalities developed and implemented by the NHHSS at the LRC for women with SPMI and with histories of sexual or physical abuse, incest, rape or sexual abuse, or other trauma, and which are survivor/consumer driven services designed to promote recovery.

U.    "Trauma-Informed" means systems and services are those that have thoroughly incorporated an understanding of trauma—including its impact and pathways to healing and recovery—in all aspects of service delivery. A trauma-informed system is committed to a policy of "safety first."

V.    "Trauma-Specific" means services whose primary task is to address the impact of trauma and to facilitate trauma recovery. Such treatment services shall be evidence based as defined in Section III E and include both individual and group interventions designed to ameliorate post traumatic stress disorder symptoms.

W.    "Sexual Abuse" for the purpose of this document, shall be as defined in LRC Policy RI-11 (LRC) which is attached hereto as Attachment A. For the purposes of this Settlement Agreement, the perpetrator of any sexual contact upon any resident of the LRC shall be presumed to have known, or should have known, that the victim was mentally incapable of resisting or appraising the nature of his or her conduct.

X.    "Severe and Persistent Mental Illness" (SPMI) is defined in the 175 NAC 35-001.01.

http://www.sos.state.ne.us/business/regsearch/Rules/Health_and_Human_Services_System/Title-471/Chapter-35.pdf)

Y.    "Women's Council" is a group that has been created at the LRC comprised of women at such facility.

Z.    "CEO" means the Chief Executive Officer of the LRC or his designee.

IV.

**MAINTENANCE OF A SAFE, THERAPEUTIC MILIEU THROUGH PROHIBITION AND ELIMINATION OF PERVASIVE VIOLENCE, INCLUDING REDUCTION OF RESTRAINT AND SECLUSION**

The Parties recognize and hereby acknowledge that in order to protect the constitutional and statutory rights and secure appropriate individualized and effective mental health treatment for the plaintiff/women, a safe, therapeutic environmental milieu is absolutely essential. Violence (or perceived violence), which is allowed to happen at all, or occurs on a frequent basis within a treatment community, seriously denies effective and individualized treatment to plaintiff/women since violence re-traumatizes plaintiff/women with histories of trauma wherein they re-live many of the same injurious psychological consequences they experienced upon their initial traumatization.

The Parties further recognize that the use of seclusion and restraint creates inherent risks to the physical safety and psychological well being for people with psychiatric disabilities. These risks include, *inter alia,* serious injury or death, retraumatization of people with a history of trauma, and loss of dignity, personal bodily integrity, and psychological harm.

Thus, in recognition of the essential need for and right to a safe, therapeutic, and non-violent treatment environment within the LRC, the following provisions have been implemented, or shall be implemented to obtain the necessary safe, therapeutic, and non-violent treatment environment within the LRC and to secure substantial compliance with the terms of the Settlement Agreement.

A.      The CEO has appointed and shall maintain in the position of Patient Advocate, an individual who is trauma informed and knowledgeable in trauma specific services, to continue to develop, promulgate, and refine existing polices and procedures regarding the prevention of

- 9 -

violence in coordination and consultation with the CEO, the Clinical Director of the LRC, and the Consumer Advisory Team (referenced in Section VI.B.1). In order to secure a safe, therapeutic, and non-violent treatment environment within the LRC, the LRC's revised policy and procedures on Abuse and Neglect (Policy R1-11 LRC, revised January 2007) is attached as Attachment A. The Patient Advocate shall report quarterly to NAS, commencing the first calendar quarter after the date this Agreement is approved by the Court, on the progress of the LRC's Performance Improvement and Risk Management Plan (Revised September/October 2006), which may include a Failure Mode and Effects Analysis (FMEA), or other CMS or JCAHO accepted performance improvement analysis/process to decrease the number of resident upon women/resident violent incidents and to promote a safer therapeutic environment and to secure substantial compliance with the terms of the Settlement Agreement.

      B.     The LRC Patient Advocate as referenced in paragraph IV.A shall, within 12 months from the date this Agreement is approved by the Court, develop, promulgate, and implement in coordination with the CEO, Clinical Director of the LRC, the Women's Council, and the Consumer Advisory Team, written practice guidelines for the creation of safe treatment milieus for plaintiff/women who have a history of trauma; trauma informed training protocols and schedules of training in the implementation of these guidelines; and trauma informed quality assurance standards. The Patient Advocate shall monitor the progress of the training schedule, and report quarterly to NAS, commencing the first calendar quarter after the date this Agreement is approved by the Court, to secure substantial compliance with the terms of the Settlement Agreement.

      C.     NHHSS, through the CEO, in coordination with the Patient Advocate, as referenced in paragraph IV.A., shall continue to enforce and refine, when needed, current trauma

informed polices and procedures, designed to initially reduce and ultimately eliminate the utilization of restraint, seclusion, at the facility. The LRC's revised policy and procedures on Restraint and Seclusion (Policy PC-02 LRC, revised August 2006) is attached as Attachment B. Policy PC-02 LRC (Attachment B) shall be reviewed by the Patient Advocate and the CEO and/or his designated representative within 30 days from the date this Agreement is approved by the Court to ensure compliance with the requirements of 42 C.F.R.§ 482.13 (e) as amended on December 8, 2006 (72 Fed. Reg. 71378-71427), and which became final and effective on January 8, 2007. If Policy PC-02 LRC (Attachment B) is determined, after review, to be out of compliance, the LRC shall develop and implement a revised policy within 90 days from the date this Agreement is approved by the Court. The Patient Advocate during the term of the Settlement Agreement shall prepare written quarterly reports to NAS, commencing the first calendar quarter after the date this Agreement is approved by the Court, of the efficacy of the current trauma informed policies and procedures and Policy PC-02 LRC to initially reduce with the ultimate goal to eliminate the utilization of restraint, seclusion, at the facility and to secure substantial compliance with the terms of the Settlement Agreement. Monthly reports of restraint and seclusion shall be maintained on the statistical information by the Patient Advocate to be incorporated in the quarterly reports set forth above.

D.     The Patient Advocate at the LRC, in coordination with the CEO and Clinical Director and Risk Manager of the LRC, shall continue to enforce, refine, review, and monitor current trauma informed policies designed to protect the plaintiff/women from sexual abuse and physical harm at the LRC as set forth in Attachments A (Abuse and Neglect), B (Restraint and Seclusion), and C (Patient/Resident Rights and Privileges) and the LRC's Performance Improvement and Risk Management Plan (Revised September/October 2006). NHHS, through

- 11 -

its Treatment Planning Process Policy and Procedures (Policy PC-16 LRC, July 2006 Revision) shall include trauma informed and trauma specific treatment interventions; and a Special Treatment Plan Review for those plaintiff/women who present histories of trauma, and who have incidents of restraint, seclusion, allegations of sexual abuse, and/or of abuse and neglect at the LRC. The Patient Advocate shall report quarterly to NAS, commencing the first calendar quarter after the date this Agreement is approved by the Court, on the number of Special Treatment Plan Reviews related to incidents of restraint, seclusion, allegations of sexual abuse, and/or of abuse and neglect at the LRC, to secure substantial compliance with Policy PC-16 LRC, July 2006 Revision, and the terms of the Settlement Agreement.

E.      NHHSS, through the Patient Advocate of the LRC, in coordination with the CEO, Clinical Director, Director of Nursing, and Risk Manager of the LRC shall continue to review and analyze all reported allegations of sexual abuse/harassment, in accordance with the LRC's policy and procedures on Abuse and Neglect (Attachment A); Restraint and Seclusion (Attachment B); and the LRC's Performance Improvement and Risk Management Plan (Revised September/October 2006) and the terms of the Settlement Agreement. Within 30 days from the date this Agreement is approved by the Court, the Patient Advocate, and NAS, as the designated Protection and Advocacy agency in Nebraska, shall be provided on a monthly basis with copies of AVATAR Crystal Reports of suspected abuse, including any allegation of sexual abuse or physical abuse resulting in injury. When the abuse is alleged to have occurred at the LRC to any woman, it shall be reported to Adult Protective Services (APS) and NAS.

F.      The LRC shall not retaliate in any way against any woman at the LRC based on her allegation of rape, sexual assault, or sexual abuse. Within 30 days from the date this Agreement is approved by the Court, the LRC shall modify its Patients/Residents Rights and

- 12 -

Privileges to include a summary of the LRC's non-retaliation policy against any woman reporting or alleging rape or sexual assault or sexual abuse, and a brief outline of the procedures in the attached Policy R1-11 (LRC) (revised January, 2007) for the woman reporting such rape, assault or abuse. The LRC shall not retaliate in any way against a direct care or clinical staff member or temporary employee at the facility based on the staff member reporting a reasonable belief that a woman at the facility has been sexually assaulted and/or sexually harassed at any time or while under the care or supervision of NHHSS.

G.     Within 12 months from the date this Agreement is approved by the Court, the LRC shall adopt a psychoeducational program that includes the following provisions:

1.     The psychoeducational program shall make provisions to ensure the inclusion of women with cognitive deficits and/or developmental disabilities.

2.     Within 12 months from the date this Agreement is approved by the Court, the LRC shall train clinical staff on the psychoeducational program for teaching women and other staff how to identify, prevent, cope with, and protect oneself from episodes of sexual harassment and abuse.

3.     Within 12 months from the date this Agreement is approved by the Court, the LRC shall evaluate the psychoeducational program for sexual harassment and abuse.

4.     The Patient Advocate shall monitor and report quarterly to NAS, commencing the first calendar quarter after the date this Agreement is approved by the Court, on substantial compliance with this paragraph.

- 13 -

## V.

## THE CONTINUATION OF APPROPRIATE MENTAL HEALTH TREATMENT FOR PLAINTIFFS/WOMEN AT THE LINCOLN REGIONAL CENTER. TRAUMA INFORMED, TRAUMA SPECIFIC SERVICES, AND PSYCHIATRIC REHABILITATION.

A. The CEO, in coordination with the Clinical Director, the Patient Advocate and the Consumer Advisory Team (VI.B.1) shall be responsible for  continuing to develop and implement  the following policies within twelve (12) months from the date this Agreement is approved by the Court:

1. A facility policy on the prohibition of all forms of violence, trauma, abuse, and retraumatization of plaintiff/women at the LRC (See, Attachment A);

2. A facility plan of consumer involvement is hereinafter described in greater detail in Section VI (See, Attachment G);

3. A facility plan developed in coordination with the Consumer Advisory Team for the integration of trauma informed, trauma specific services, and trauma based treatment programs which are evidenced based treatments as defined in Section III.C;

4. The review and revision, if necessary, of all systemic polices and regulations of the LRC, including, but not limited to, seclusion/restraint policies, assessment and screening policies, training and staff development, to ensure that the polices and regulations are designed to help protect the plaintiffs and women with histories of trauma and are trauma informed; and

5. The development with the Clinical Director of the LRC training protocols and schedules for the clinical staff and the direct support staff on trauma informed systems and trauma specific services.

B.      The Clinical Director and the Patient Advocate shall continue to implement current Trauma Informed, Trauma Specific, PREP, Models, and Services at the LRC that are designed to help prevent plaintiff/women from experiencing physical and psychological harm and provide appropriate individualized mental health treatment.      Those current Trauma Informed, Trauma Specific, PREP, Models, and Services at the LRC include, *inter alia*, the LRC's Trauma Symptom Assessment Protocol LRC Psychology Service Updated 11-16-06, attached as Attachment E; and The Mandt System Manual (a portion, solely for identification purposes, is attached as Attachment F) is fully incorporated by reference as an integral part of the Settlement Agreement between the Parties as if fully set forth within the Settlement Agreement.

C.      The LRC shall continue to conduct comprehensive individualized evaluations within a multidisciplinary model with trauma assessments and trauma screens addressing trauma histories, biological, psychological, and social needs; provide individualized treatment with trauma informed and trauma specific treatment models; provide individualized rehabilitation treatment of appropriate biopsychosocial treatment modalities; and comprehensive discharge planning into appropriate community based mental health services.

D.      A comprehensive multidisciplinary admission evaluation at the LRC shall continue to be conducted by clinically qualified staff, trained in the recognition, screening, and assessing of trauma sequaela; and the evaluation shall include specific sections regarding past emotional, physical, and sexual trauma.      The trauma assessment section in the admission evaluation shall continue to include, but not limited to, the following:

1.      A psychometrically based trauma screen for post-traumatic symptoms comporting with current best practice standards developed by Plaintiffs' trauma experts or comparable nationally recognized trauma experts agreed upon by the Parties;

- 15 -

2.      The trauma assessment section and trauma screen developed shall be based upon scientific research (that involves the application of rigorous, systematic, and objective procedures to obtain reliable and valid knowledge relative to trauma treatment issues);

3.      The trauma assessment shall interface the past traumative experience(s) with current psychiatric symptom and behavior management; identify the past sexual and physical abuse history into the diagnosis and treatment of each resident;

4.      The individual admission trauma assessment shall be reviewed and reassessed when current psychiatric symptoms and behavior warrant or when clinical information suggests a past abuse history that had not previously been noted; and

5.      The trauma assessment and trauma screen shall be made an integral part of the treatment records and shall be designed for utilization in the development and implementation of the individualized treatment plans.

E.      The Patient Advocate, in coordination with designated clinical and professional staff of the LRC, shall have the authority to do the following: reviewing the trauma assessments and trauma screens to ensure compliance with best practices; compiling statistical information on numbers of women presenting with histories of trauma including the number of women and their participation in which of the trauma treatment programs, the number of successful women in the array of trauma treatment programs, and the duration of the women's participation in the trauma treatment programs; assuring that the assessments comport with best practices; ensuring that the staff are qualified, initially trained in the recognizing, screening, and assessing for trauma, and annually attend retraining in the screening and assessing for trauma; and submitting quarterly reports, commencing the first calendar quarter after the date this Agreement is approved by the

- 16 -

Court, with recommendations to the CEO and NAS to ensure substantial compliance with the terms of the Settlement Agreement.

F.      In order to ensure substantial compliance with Policy PC-16 LRC (July 2006 Revision), and the terms of the Settlement Agreement, the individualized treatment plan for each plaintiff/woman shall continue to be based on the multidisciplinary evaluations, the initial trauma assessment, the initial trauma screening, supplemental trauma assessments, and Special Treatment Plan Review due to subsequent disclosure of exposure to trauma whether from within or without the LRC.

## VI.

## POLICIES, STANDARDS, AND PROCEDURES ASSISTING PLAINTIFF/WOMEN IN THEIR EXERCISE OF PROTECTED RIGHTS TO A SAFE THERAPEUTIC ENVIRONMENT AND APPROPRIATE MENTAL HEALTH TREATMENT

A.      GRIEVANCE SYSTEM. The LRC shall have a grievance system consistent with the requirements of 42 C.F.R. § 482.13 and 175 NAC. The LRC's Grievance Policy and Procedure(Policy R1-12 LRC July 2006 Revision), Attachment D, shall be modified to include procedures for verbal grievances as required by 42 C.F.R. § 482.13 (a) (2) (i) within 60 days from the date this Agreement is approved by the Court. The Patient Advocate shall review and supervise all grievances filed by residents at each such facility and expedite the comprehensive resolution of grievances filed by residents. The handling of grievances appealed by a resident from a decision by the CEO to NHHSS shall be governed by 175 NAC 9.

B.      CONSUMER INVOLVMENT

1.      The CEO shall continue to increase consumer involvement in evaluating and monitoring the services provided to women at the LRC through a Consumer Advisory Team, which shall include at least one female member appointed pursuant to the LRC's Policy on Consumer Involvement (Policy RI-38 LRC) attached as Attachment G. Increased consumer

- 17 -

involvement in the evaluation and monitoring of services provided to plaintiff/women at the LRC shall additionally be accomplished by the increased involvement of the Women's Council.

2.     Within 30 days from the date this Agreement is approved by the Court, the CEO shall appoint a trauma-informed female staff member, who shall provide support in the development and functioning of the Women's Council. The trauma-informed female staff member appointed by the CEO to provide support to the Women's Council may be the Patient Advocate. Within 30 days from the date this Agreement is approved by the Court, the CEO or the appointed trauma-informed female staff member appointed to provide support to the Women's Council, shall explain to the plaintiff/women the respective functions of the Women's Council. The Women's Council shall include the female residents of each program area; provided, however, that in the event that the requirements of treatment would prevent commingling of program area members to participate in the Women's Council, then each program area shall have a separate Women's Council. The NAS representative(s) and the on-site designated trauma-informed female staff member shall assist women in the continued development of said Women's Council at each such location within the LRC. The Women's Council shall meet a minimum of once per month with the facility's CEO, or designated representative, and the Patient Advocate to discuss issues and the resolution of those issues impacting on women residents. The Women's Council shall be afforded confidentiality in their communications with the facility's CEO, or designated representative, and the Patient Advocate during its monthly meeting. The LRC shall not retaliate in any way against any woman of the Women's Council for raising issues at its monthly meeting or in the filing of any group grievance with the CEO as permitted in Section VI.A. The Women's Council may meet to

- 18 -

discuss issues which impact women at the LRC, alone with the NAS representative(s) and without the presence of staff or the Patient Advocate.

        a.      All Women's Council meetings shall be conducted in a manner which will assure that male residents at the facility do not overhear the meeting.

        b.      If a majority of the Women's Council desire, they may invite female members of the Consumer Advisory Team to observe and participate in meetings.

        c.      Upon a request by a majority of the Women's Council, the Women's Council as a whole may file a grievance with the CEO or designee as permitted in Section VI.A. of the Settlement Agreement or contact the NAS representative or the Consumer Advisory Team with its concerns. If such grievance is filed or contact with either the NAS representative or the Consumer Advisory Team occurs by the Women's Council, the LRC shall not retaliate against any of the members of the Women's Council.

        d.      A female representative of NAS may attend the Women's Council meetings, unless specifically directed not to attend by a majority of the Women's Council.

        e.      The meetings of the Women's Council shall be held at a time convenient for a majority of its members and the female NAS representative.

<h2 align="center">VII.</h2>

<h3 align="center">FINAL SETTLEMENT PRINCIPLES</h3>

A.      The Parties are of the belief and anticipate that all provisions of the Settlement Agreement can be achieved within eighteen (18) to twenty-four (24) months of from the date this Agreement is approved by the Court.

B.      Nothing in this Settlement Agreement shall preclude NHHSS or the State of Nebraska from modifying or enacting policies, procedures, or regulations to reflect changing or

additional federal or state laws, controlling judicial decisions, or interpretations by the federal government with respect to the treatment of individuals with mental illness. Upon revision of any existing policies or procedures referenced in this Settlement Agreement, NAS shall be provided with copies of these policies or procedures within thirty (30) days of their enactment.

C.      Within thirty (30) days of each deadline in the Settlement Agreement, Defendants shall supply to NAS a status report showing substantial compliance; if noncompliance, the reasons for the delay and the expected date for substantial compliance.

D.      This Settlement Agreement, including all the attachments referenced; and, additional LRC policies and procedures referenced in the Settlement Agreement and the attachments, is the complete expression of the agreement of the parties hereto and nothing outside of this Settlement Agreement may be used to supplement or contradict the terms of this Settlement Agreement.

E.      Nothing in this Settlement Agreement shall constitute an admission of any liability of any kind by the Defendants as to the present litigation or with respect to any other claims, including tort claims now or hereafter made by any Plaintiff.

F.      All attachments and referenced policies in this Settlement Agreement are incorporated by reference as if set forth verbatim and are an integral part of this document.

G.      The individual damage claims of the named Plaintiffs, filed in State District Court, remain ready for trial subject to all asserted or available claims and defenses.

H.      All provisions of the Settlement Agreement shall have ongoing effect until the final dismissal of this action. The Court shall retain jurisdiction of this action for all purposes under this Settlement Agreement until the Defendants have achieved substantial compliance of the provisions of the Settlement Agreement. The Defendants may move for dismissal of the

- 20 -

case on the grounds that the Defendants have achieved substantial compliance with the provisions of the Settlement Agreement. If Plaintiffs object to the Defendants' motion for dismissal, the determination of substantial compliance with the terms of the Settlement Agreement shall be consistent with professional judgment exercised by qualified professionals pursuant to the definition of "professional judgment" contained in Section III, J.

I.      Any motion for cause seeking to extend jurisdiction must be filed on or before March 1, 2009.

J.      The Parties agree that the Parties have achieved substantial assistance to plaintiff/women in their exercise of protected rights to a safe, therapeutic environment and appropriate trauma informed and trauma specific mental health treatment; however, the Parties further agree that neither party shall be deemed a "prevailing party" for purposes of this litigation, and neither party shall seek an award of expenses, costs, attorneys' fees, or a negotiated reduced attorneys' fees, under prevailing party standards. The Parties agree to each bear their own costs and expenses, and Defendants agree to pay $50,000.00 towards Plaintiff's costs and expenses, said amount to be paid within 30 days from the date this Agreement is approved by the Court.

(Remainder of Page Intentionally Left Blank)

**Approved as to form and on behalf of the Plaintiffs by:**

Date: March 28, 2007

Bruce G. Mason, # 12626
Lead Attorney for Plaintiffs
Litigation Director
Nebraska Advocacy Services, Inc.
134 South 13th Street-Ste. 600
Lincoln, NE 68508
Phone: (402) 474-3183
Fax: (402) 474-3274
Email: bruce@nas-pa.org
Bmasonlaw@cox.net

Date: March 28, 2007

Michael J. Elsken, # 18629
Attorney for Plaintiffs.
Nebraska Advocacy Services, Inc.
134 South 13th Street, Ste. 600
Lincoln, NE 68508
Phone: (402) 474-3183
Fax: (402) 474-3274
Mike@nas-pa.org

**ATTORNEYS FOR PLAINTIFFS**

Date: MARCH 28 2007

Timothy F. Shaw, CEO
Nebraska Advocacy Services, Inc.
134 South 13th Street-Ste. 600
Lincoln, NE 68508
Phone: (402) 474-3183
Fax: (402) 474-3274

- 22 -

**Approved on behalf of the Defendants by:**

Date: MAR 2 8 2007

Christine Z. Peterson, Chief Administrative
Officer, Nebraska Health and Human
Services System

Date: March 28, 2007

William Gibson, Chief Executive Officer of
the Lincoln Regional Center, the Hastings
Regional Center, and the Norfolk Regional
Center

**Approved as to form on behalf of the Defendants by:**

Date: March 28, 2007

Michael J. Rumbaugh, #13612
Assistant Attorney General,
Attorney for Defendants
2115 State Capitol
P.O. Box 98920
Lincoln, NE 68509-8920
(402) 471-2682
Mike.rumbaugh@ago.ne.gov

**ATTORNEYS FOR THE DEFENDANTS**

**Approved by the United States District Court for the District of Nebraska.**

Date: March 29, 2007

Lyle E. Strom, Senior Judge
United States District Court for the District
of Nebraska

- 23 -

# LINCOLN REGIONAL CENTER

Administrative Policies and Procedures

# Policy RI-11 (LRC)

| | | | |
|---|---|---|---|
| **Effective Date:** | April 16, 2004 | **Position Accountable:** | Chief Executive Officer |
| **Latest Review Date:** | January 2007 | **Approved By:** | William Gibson, CEO |
| **LATEST REVISION DATE:** | January 2007 | *(Original signed policy on file in Administration)* | |

# ABUSE OR NEGLECT

### PURPOSE:

To protect the rights of those who reside and work at LRC, those accused as well as those reporting, and to set forth policy on abuse and neglect.

### POLICY:

Employees are prohibited from any type of abuse or neglect of vulnerable persons who reside in or receive services from LRC. It is a felony for state Health and Human Services workers to have sexual contact, consensual or nonconsensual, with any person in the state's care. Punishment can be up to 20 years in prison. Employees shall adhere to all requirements mandated by the Adult Protective Services Act, Child Protective Services Act and all applicable CMS requirements for client protection. Each employee is responsible for treating individuals with dignity, kindness, respect, proper care, and consideration.

Employees are required to report all observed or suspected cases of abuse or neglect as required by the "Responsibilities" section of this policy. Failure to do so may result in personnel disciplinary action. Pursuant to and in accordance with Neb. Rev. Stat. Sec. 28-375, employees are immune from civil or criminal liability for the act of reporting suspected abuse or neglect, and/or participating in an investigation of alleged abuse or neglect, provided the employee performs those acts in good faith. The facility will not tolerate retaliation on the part of any HHSS employee against an individual who reports an alleged incident or cooperates with an investigation.

Employees who have witnessed and/or reported allegations of abuse or neglect to the proper authorities, and supervisors and administrative staff members who have received reports of abuse will maintain a strict level of confidentiality to assure the protection of the privacy rights of all those involved. Confidentiality should be maintained on and off the job. Violation of confidentiality could result in legal consequences.

All employees will be provided training on policies and procedures defining abuse and neglect and procedures for reporting. The facility shall document the provision of such instruction.

### DEFINITIONS:

**Abuse:** Any knowing, intentional, or negligent act or omission on a part of a person which results in physical, sexual, verbal or mental abuse, unreasonable confinement, cruel punishment, exploitation, or denial of essential care, treatment or services to a client.

**Cruel Punishment:** Punishment, which intentionally causes physical injury to a vulnerable person.

A

# ABUSE OR NEGLECT                                    Policy RI-11 (LRC)

**Denial of Essential Services:** Essential services are denied or neglected to such an extent that there is actual physical injury to a vulnerable person or imminent danger of the vulnerable person suffering physical injury or death. Essential services shall mean those services necessary to safeguard the person or property of a vulnerable person. Such services shall include, but not be limited to, sufficient and appropriate food and clothing, shelter, treatment for physical needs, and proper supervision.

**Employee:** Any consultant, employee or volunteer at the facility.

**Exploitation:** The taking of property of a vulnerable adult by means of undue influence, breach of a fiduciary relationship, deception, extortion or by any lawful means.

**Failure to Intervene in an Altercation:** Allowing physical conflicts/fights (biting, hitting, kicking, pulling hair, scratching, etc.) between patients and staff or between patients to continue.

**Imminent Danger:** As used in this section, means a danger that is on the point of happening. It is an immediate risk of harm. Threat of harm is real, believable, person is capable, and the threat is immediately upon self or others.

**Mental Abuse:** Any act which results, or has the potential to result in psychological/mental/emotional harm, intimidation, humiliation or trauma, including but not limited to harassment, unwanted teasing, derogatory statements of a personal nature, threats of punishment, physical harm, deprivation and denial of treatment or needed services.

**Neglect:** Failure to provide minimal services or resources to meet basic needs. Neglect includes withholding or inadequately providing food and hydration (without physician, patient, or surrogate approval), clothing, medical care, and good hygiene. It may also include placing the patient in unsafe conditions.

**Physical Abuse:** Any knowing, intentional or reckless act or omission, which results in physical injury.

**Physical Injury:** Damage to bodily tissue caused by non-therapeutic conduct, including, but not limited to, fractures, bruises, lacerations, internal injuries, or dislocations and shall include, but not be limited to, physical pain, illness, or impairment of physical function.

**Physical Pain:** A sensation, assessed for severity as follows:
        a. Vocalization of pain
        b. Persistence of pain
        c. The act was clearly abusive even without persistent pain.
        d.

**Violation of Patient Rights:** It will be considered abuse if a patient has restraint or seclusion of any form imposed as a means of coercion, discipline, convenience or retaliation by staff.

**Sexual Abuse:** Includes, but is not limited to: sexual assault, sexual coercion, sexual contact, sexual harassment, or sexual penetration.

    **Sexual Assault:** Subjecting another person to sexual contact or penetration by force, threat of force, expressed or implied, coercion, or deception; or the perpetrator knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct.

    **Sexual Coercion:** The use of express or implied threats of violence or reprisal or other intimidating behavior that puts a person in fear of the consequences in order to compel that person to act against his or her will.

    **Sexual Contact:** The intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor.

# ABUSE OR NEGLECT                                    Policy RI-11 (LRC)

**Sexual Harassment:**   Harassment of a sexual nature or otherwise gender directed which may include but is not limited to sexually offensive language that is personally directed.

**Sexual Penetration:** Sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes.

**Unreasonable Confinement:** Confinement which intentionally causes physical injury to a vulnerable person.

**Verbal Abuse:** Any communication, whether oral, written, or gestured, that intentionally or unintentionally threatens, frightens, degrades, mocks, harasses or insults another person. This includes derogatory or disparaging terms to a client or their families, or within the hearing distance regardless of age, ability to comprehend or disability.

## RESPONSIBILITIES:

## A. Employee to Patient Allegations of Abuse/Neglect Responsibilities

## Employee Responsibilities

1.   When an employee observes or is informed of abuse/neglect, they will intervene immediately to protect the patients, staff members, and others.

2.   Provide a report of the observed, or suspected, abuse/neglect to the supervisor of the patient care area immediately after ensuring the safety of the patient. An employee's failure to make a timely report of abuse or neglect can result in disciplinary action.

   - If the supervisor cannot be reached or was involved in the alleged abuse or neglect, the employee must report to the next highest supervisor available at all times.

3.   Supervisor designates one reporting staff member to complete all appropriate incident reports no later than end of shift.  The incident report must contain:

   - A complete and thorough description of the nature and extent of the alleged abuse or neglect
   - Date, place, and time the abuse/neglect occurred, and
   - A listing of all possible witnesses to the incident in question.
   - Immediate action taken.

4.   Employees who may have knowledge of the alleged abuse/neglect will be required to give a written witness statement of the incident.  Written statements will be prepared by the end of the shift.

5.   All employees will maintain a strict level of confidentiality about the matter to assure the protection of the privacy rights of the patient and staff member involved.  DO NOT DISCUSS THE INCIDENT WITH INDIVIDUALS OUTSIDE OF THE INVESTIGATION PROCESS, with the exception of the Union Steward or Counsel.

# ABUSE OR NEGLECT **Policy RI-11 (LRC)**

## Supervisor of the Patient Care Area Responsibilities

1. Ensure the protection of the patient. Arrange for assessment for any needed treatment of the patient with proper documentation in the medical record.

    - *In the event of suspected or actual sexual abuse, supervisor shall ensure that arrangements are made to immediately transport the patient to a hospital emergency room where a physical exam and evidence collection shall take place.*

2. Remove the accused employee from all patient care areas immediately pending investigation to ensure the protection of the patient and the staff member.

3. Notify the CEO immediately.

4. Preserve any evidence. Nebraska State Patrol requests the following interventions be taken for allegations of criminal action:

    - Remove patients and staff members from the crime area.
    - Preserve the crime scene. Leave everything untouched.
    - Keep potential witnesses separated.

5. Ensure personnel take pictures of potential signs of abuse (e.g., bruises, injuries)

6. Designate the reporting staff member to complete the incident report. Receive written report of the alleged abuse/neglect incident from reporting staff member.

7. Secure initial statements from all staff members identified as witnesses and of all employees who may have knowledge of the alleged abuse/neglect incident.

8. Assure all applicable forms are completed and distributed.

9. Report allegations to designated facility personnel. The CEO needs immediate notification of all Sentinel Events (unexpected occurrence involving death or serious physical or psychological injury or risk thereof).

10. The supervisor or designee must report allegations of abuse or neglect to APS/CPS by telephone or fax as soon as is practicable within 24-hours of the incident. The report can be made by calling the statewide toll-free, 24-hour Abuse/Neglect Hotline, 800-652-1999, or by fax and providing the required information.

    Allegations to be **reported** to Protective Services include acts or omissions **on the part of the caregiver/employee,** which result in:

    1. Cruel Punishment
    2. Denial of essential services to a vulnerable person
    3. Exploitation
    4. Failure to interrupt per policy self-abusive, self-injurious behaviors
    5. Failure to intervene in a physical conflict/fight.
    6. Failure to provide appropriate care and treatment services for accidents or injuries
    7. Mental abuse
    8. Physical Injury
    9. Sexual Abuse
    10. Unreasonable Confinement
    11. Verbal Abuse

# ABUSE OR NEGLECT                                    Policy RI-11 (LRC)

Allegations to be **reported** to Protective Services include acts or omissions **on the part of a patient or other non-staff person**, which results in:

      1.    Exploitation
      2.    Physical Injury
      3.    Sexual Abuse
      4.    Unreasonable Confinement

Allegations **NOT to be reported** to Protective Services include acts or omissions **on the part of a patient or other non-staff person, which** result in:

      1.    Mental Abuse
      2.    Verbal Abuse

11. The supervisor will work with the Risk Management Director to ensure that all allegations of criminal action are reported to the Nebraska State Patrol, either directly or through pre-arranged protocols with protective services. This report must be made as soon as is practicable within 24-hours of the incident. Nebraska State Patrol investigates alleged criminal acts and then determines if there is a need to involve the County Attorney.

12. Instruct all staff members not to discuss the allegation with individuals outside the investigation process – **CONFIDENTIALITY!!!**

13. Acknowledge receipt of the Abuse/Neglect incident report by signing and dating report, and forward all written documents to designated facility personnel.

14. Ensure the guardian/individual designated for emergency notification is notified per facility protocol.

15. Work with the HR Manager to ensure, if disciplinary action is taken, that it is consistent with the Labor Contract and Classified Rules and Regulations.

16. Assure a Treatment Plan Review is completed per facility clinical policy.

## B. Patient to Patient and/or Patient Allegations of Abuse

### Employee Responsibilities

1. When an employee observes or is informed of abuse, they will intervene immediately to protect the patients, staff members, and others.

2. Provide a report of the observed, or suspected, abuse to the supervisor of the patient care area immediately after ensuring the safety of the patient. An employee's failure to make a timely report of abuse can result in disciplinary action.

3. Supervisor designates one reporting staff member to complete all appropriate incident reports no later than end of shift. The incident report must contain:

        • A complete and thorough description of the nature and extent of the alleged abuse
        ▪ Date, place, and time the abuse occurred, and
        ▪ A listing of all possible witnesses to the abuse in question.
        ▪ Immediate action taken.

4. Employees who may have knowledge of the alleged abuse will be required to give a written witness statement of the incident. Written statements will be prepared by the end of the shift.

## ABUSE OR NEGLECT
## Policy RI-11 (LRC)

### Supervisor Responsibilities

1. Ensure the protection of the patient. Arrange for assessment for any needed treatment of the patient with proper documentation in the medical record.

   *In the event of suspected or actual sexual abuse, supervisor shall ensure that arrangements are made to immediately transport the patient to a hospital emergency room where a physical exam and evidence collection shall take place*

2. Consult with the Director of Risk Management immediately for review of the situation and determination of course of action.

3. Preserve any evidence. Nebraska State Patrol requests the following interventions be taken for allegations of criminal action:

   - Remove patients and staff members from the crime area.
   - Preserve the crime scene. Leave everything untouched.
   - Keep potential witnesses separated.

4. Ensure personnel take pictures of potential signs of abuse (e.g., bruises, injuries)

5. Designate the reporting staff member to complete the incident report. Receive written report of the alleged abuse/neglect incident from reporting staff member.

6. Secure initial statements from all staff members identified as witnesses and of all employees who may have knowledge of the alleged abuse/neglect incident.

7. Assure all applicable forms are completed and distributed.

8. Report allegations to designated facility personnel. The CEO needs immediate notification of all Sentinel Events (unexpected occurrence involving death or serious physical or psychological injury or risk thereof).

9. The supervisor or designee must report allegations of abuse or neglect to APS/CPS by telephone or fax as soon as is practicable within 24-hours of the incident. The report can be made by calling the statewide toll-free, 24-hour Abuse/Neglect Hotline, 800-652-1999, or by fax and providing the required information.

### C. Historical Allegations of Abuse/Neglect

Historical abuse is defined as abuse/neglect that happened prior to the patient's hospitalization at the Lincoln Regional Center.

### Employee Responsibilities

1. When an employee is informed of a historical abuse/neglect, they will immediately report incident to Supervisor.

2. Provide a report of the abuse/neglect to the supervisor of the patient care area immediately. An employee's failure to make a timely report of abuse or neglect can result in disciplinary action.

# ABUSE OR NEGLECT                                   Policy RI-11 (LRC)

3. Supervisor designates one reporting staff member to complete all appropriate incident reports no later than end of shift. The incident report must contain:

- A complete and thorough description of the nature and extent of the alleged abuse or neglect
- Date, place, and time the abuse/neglect occurred, and
- A listing of all possible witnesses to the abuse/neglect in question.
- Immediate action taken.

4. Employees who may have knowledge of the alleged abuse/neglect will be required to give a written witness statement of the incident. Written statements will be prepared by the end of the shift.

## Supervisor Responsibilities

1. Ensure the protection of the patient. Arrange for assessment for any needed treatment of the patient with proper documentation in the medical record.
   *In the event of suspected or actual sexual abuse, supervisor shall ensure that arrangements are made to immediately transport the patient to a hospital emergency room where a physical exam and evidence collection shall take place*

2. Notify the Director of Risk Management immediately.

## Medical Staff Responsibilities:

1. Examine the patient for injuries. Provide necessary treatment. Document findings and treatment in medical record.

2. Facilitate transfer to acute care hospital, when appropriate.

## Social Worker Responsibilities

1. Upon notification of alleged incident, notify parent, guardian, or other person designated for emergency notification (per facility protocol) of the allegations. DO NOT disclose name of witnesses or alleged abusers. Assure guardians that a thorough investigation is being conducted.

## Abuse/Neglect Investigator Responsibilities

1. The investigator will keep the Risk Management Director or designee apprised of events as investigation proceeds.

2. Upon notification of alleged abuse/neglect, secure incident report and witness statements.

3. Collect statements/interviews of all persons who may have first-hand knowledge or information regarding the alleged incident and complete investigations within five (5) working days of report of the incident, unless there are extenuating circumstances, which require a CEO approved extension.

4. Report investigation findings to the Risk Management Director.

5. Maintain confidential files for all cases of abuse/neglect.

# ABUSE OR NEGLECT Policy RI-11 (LRC)

## Risk Management Director Responsibilities:

1. The Risk Management Director will ensure that all abuse/neglect incidents are investigated.
2. Will report incidents and findings to the Leadership Team.

## The LRC Leadership Team Responsibilities:

1. LRC Leadership Team Members will review all Internal Investigative Reports and the weekly Behavioral Incidents.
2. LRC Leadership Team Members will identify any trends/patterns/plans of action that need to be addressed on the unit, assess, and evaluate training needs.

## Chief Executive Officer Responsibilities:

1. The CEO shall enforce all policies and procedures that govern abuse/neglect reporting and investigations. The CEO shall be responsible to consult with HR to assure that all provisions of the Labor Contract and Classified Rules and Regulations will be followed.

2. The CEO shall assure that root cause analysis is conducted as appropriate.

3. The CEO, or designee, shall report (by personal report, voicemail, or email) all Sentinel Events or unexpected occurrence involving death or serious physical or psychological injury or risk thereof to the Director of Health and Human Services within 24 hours of the incident.

4. A report of abuse or neglect cases shall be made to the designated facility committee and at each Governing Body Meeting. An annual report that summarizes the aggregate data for the calendar year will also be submitted to the Governing Body. This report will include the number of alleged cases of staff to patient abuse or neglect, and patient-to-patient abuse, as well s the number of cases reported to the hotline, and the number of substantiated cases in each category.

In the event that an incident occurs or is alleged that is considered a sentinel event, CMS should be notified as soon as possible. A root cause analysis of this sentinel event would follow.

---

See also:

**HHSS Policy on Abuse and Neglect**
**Incident Reporting Policy**
**Policy R1-01 (LRC) – Patient Rights**
**Policy R1-04 (LRC) – Ethics Committee**

---

**LINCOLN REGIONAL CENTER**                              **Policy PC-02 (LRC)**

Administrative Policies and Procedures

| Original Effective Date: | September 1977 | Position Accountable: | Clinical Director |
|---|---|---|---|
| Latest Review Date: | August 2006 | Approved By: | William R. Gibson, CEO |
| LATEST REVISION DATE: | August 2006 | (Original signed policy on file in LRC Administration.) | |

# RESTRAINT AND SECLUSION

## PURPOSE:

This policy provides guidelines for appropriate use of restraint and seclusion. The use of restraint and seclusion poses an inherent risk to the physical safety and psychological well being of the patient and staff. Restraint and seclusion are used only in emergency situations. Nonphysical interventions are the first choice as an intervention, unless safety demands an immediate physical response.

## POLICY:

It is the policy of the Lincoln Regional Center that any use of restraint and / or seclusion is limited to emergencies in which there is an imminent risk of a patient physically harming him/herself, staff, or others and nonphysical interventions have not been effective. Restraint/seclusion is only to be used when clinically necessary to protect the patient or others from harm and other less restrictive alternatives have failed. The initial assessment of each patient at admission includes obtaining information about the patient that could help minimize the use of restraint or seclusion. Restraint / Seclusion use is an exceptional event, not a routine response to a certain condition or behavior. It is a last resort. Threats of restraint or seclusion to control behavior are not approved and may be considered verbally abusive. The patient has the right to be free from seclusion and restraints, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff.

## APPROVED PROCEDURES include:

*   Restraint - the term "restraint" includes either a physical restraint, a drug that is being used as a restraint, or personal restraint-the application of physical force without the use of any device, for the purposes of restraining the person's freedom of movement. (ALL restraint starts with the involuntary, from the patient's perspective, laying on of hands). Physically holding a patient during a forced psychotropic medication procedure is considered physical restraint.

    -   A physical restraint is any manual method or physical or mechanical device, material, or equipment attached or adjacent to the patient's body that he or she cannot easily remove that restricts freedom of movement or normal access to one's body.
    -   A drug used as a restraint (chemical restraint) is a medication used to control the behavior or to restrict the patient's freedom of movement and is not a standard treatment for the patient's medical or psychiatric condition. This would include use of medication exceeding FDA approved dosing or not following National Practice Standards. It is the policy of the Lincoln Regional Center that chemical restraints will not be used.

## EXAMPLES OF RESTRAINT:

-   A patient is angry/assaultive, has been offered a prn but refuses. Staff needs to physically hold this patient to administer an IM prn. *This is considered restraint.*
-   Wrapping a patient in a blanket to transport them to seclusion *is considered restraint.*

B

- Two patients are angry and physically fighting with each other. Staff intervenes by physically stepping between the two patients using their hands on the patients to separate; one of the patients continues to struggle, attempting to assault staff requiring physical intervention. *__This is considered restraint.__* If staff intervene & no further struggling pursues *__this situation would not be considered restraint.__*

- Seclusion - Seclusion is the involuntary confinement of a person in a room or an area where the person is physically prevented from leaving OR they think they can not leave. The room may be locked or unlocked.

  Seclusion is different from timeout. **Timeout** means the restriction of a patient for any period of time to a designated area from which the patient is not physically prevented from leaving and for the purpose of providing the patient an opportunity to regain self-control.

Restraint or seclusion may be initiated by a Registered Nurse who is authorized by the Director of Nursing Services to do so. In an emergency situation, trained direct care staff may apply approved Mandt holds until an RN arrives on the scene.

A physician's order for the use of the procedure must be obtained either during the emergency application of the procedure or immediately after the procedure. When the order is obtained the nurse shall obtain the patient's criteria for release from the MD / APRN. (Example: Calm, cooperative for 10/15", No verbal / physical aggression; etc.) Any physician's verbal order shall be countersigned as soon as possible but not more than 24 hours after implementation of the order.

An MD / APRN shall perform a face-to-face physiological and psychological assessment within one hour of implementation of any restraint or seclusion procedure. If a patient who is restrained for combative, assaultive or violent behavior quickly recovers and is released before the MD/APRN arrives to perform the assessment, the MD/APRN must still see the patient face-to-face to perform the assessment within one hour after the initiation of this intervention. A face-to-face assessment shall be conducted at least every 8 hours for adults and every 4 hours for adolescent patients.

As early as feasible in the restraint or seclusion process, the patient is to be made aware of the rationale for restraint or seclusion and the behavior criteria for its discontinuation.

Orders for the use of restraint or seclusion must never be written as a standing order or on an as needed (PRN) basis. Each order for a restraint or seclusion procedure shall be time-limited, as determined by the physician/APRN based on an individualized assessment, and should not exceed the expected time required for the patient to no longer be in need of restraint or seclusion. In no case shall the order be written to exceed 4 hours for adults or 2 hours for adolescents. The use of restraint or seclusion must be limited to the duration of the emergency safety situation regardless of the length of the order. If restraints or seclusion are discontinued prior to the expiration of the original order, a new order must be obtained prior to reinitiating seclusion or reapplying the restraint and the requirements restart.

When the original order is about to expire, a nurse can telephone the physician or licensed independent practitioner (APRN), report the results of his/her most recent assessment, and request that the original order be renewed for another period of time. The order obtained can not exceed the 4 hour limit for adults or the 2 hour limit for adolescents. The original order may only be renewed in accordance with these limits for up to a total of 24 hours. For each restraint and / or seclusion order the nurse shall document the patient assessment, physician / APRN notification, and what if any, new orders were received in the progress notes.

All restraint and seclusion situations will be reported to the designated manager on call within the shift that the incident occurred. All incidents of restraint and seclusion are reviewed weekly by the Lincoln Regional Center Leadership Team.

The treatment team shall review the patient's treatment plan on the first working day after the event (Special Treatment Plan Review Form #70-5-149) with each restraint or seclusion episode. For multiple episodes in a 24-hour period one review will be held. If continuous restraint or seclusion is necessary

(typically in FMHS for patients on special programs) a Special Treatment Plan Review will be held upon implementation and at least weekly thereafter until special program discontinued.

The Clinical Director shall be immediately notified by the Registered Nurse of any instance in which a patient remains in restraint or seclusion for more than 12 hours, or experiences two or more separate episodes of restraint and/or seclusion of any duration within 12 hours.

If a special treatment procedure exceeds 24 hours in duration, the Clinical Director shall review the case and a notation shall be made in the progress note in the patient's medical record. If the Clinical Director is the attending physician in such a case, the President of the Medical Staff, or designee, shall review the special treatment procedure and shall make a notation in the progress note. Thereafter, the Clinical Director is notified every 24 hours if either of the above conditions continues.

Staff involved in restraint and seclusion procedures are trained and able to demonstrate competency in the safe use of restraint and seclusion. Ongoing restraint and seclusion education and training is provided both as a part of the initial orientation of all new staff and as a part of ongoing in-service training for all staff who have direct patient care responsibilities, responsibilities for the application of restraint, or the monitoring or assessment of patients in restraint or seclusion.

## FAMILY NOTIFICATION:

Adolescents:    Family/guardians shall be notified when restraint and/or seclusion is used, as required by the HHS Nebraska Medical Assistance Program, Title 471 NAC 32.000 (Chapter 32). Family/guardians are provided a copy of this policy upon admission.

Adults:    When an adult patient gives approval to notify family, or when an adult patient has a guardian and the family member/guardian indicates they wish to be notified, the assigned Social Worker shall notify the family/guardian that a restraint or seclusion procedure has been used. Family/guardians are provided a copy of this policy upon admission.

## PROCEDURE:

When restraint or seclusion procedures are used, LRC Form 70-5-35 shall be initiated immediately, with Items 1-9 completed within 15 minutes by the RN or physician responsible for the patient's care.

Upon completion of the restraint or seclusion procedure, LRC Form 70-5-35 shall be completed and sent to the Associate Director of Nursing / Designee who shall review and initial the form. The form shall then be placed in the patient's medical record file (in the Medical Records Room in each program). Copies of all Form 70-5-35's shall be faxed to the Health Information Management office by the Associate Director of Nursing / Designee. The HIM office will enter this information into the hospital's computer system. The hospital collects restraint and seclusion data to monitor and improve its performance of processes that involve the risks associated with restraint and seclusion.

On rare occasions, a patient will request an intervention procedure for his/her own protection/security. If an intervention is used, all aspects of this policy and procedure must be followed except that "at own request" shall be a satisfactory rationale and "less restrictive means" need not be documented. These requests need to be addressed in the treatment plan to reduce their occurrence.

All patients will be monitored during restraint and seclusion procedures through continuous in-person (one-to-one) observation.

The following shall be checked:

1. Signs of any injury associated with applying restraint or seclusion.

2. Patients are assessed at a minimum of every 15 minutes throughout the duration of the restraint or seclusion procedure. Documentation of the 15-minute assessments is made on form 70-5-35.

3. The patient's vital signs are monitored for relevance to the physical safety of the patient in full bed restraints every 2 hours. If the patient is unable to cooperate (i.e., continued combativeness, violence, extreme agitation), the patient's behavior will be documented by the R.N.

4. The patient's circulation is not impaired and the restraint used does not cause any physical injury or pain.

5. The patient shall be given an opportunity for exercise of all limbs at least every 2 hours for at least 10 minutes.

6. The patient shall be provided sufficient food and fluids.

7. The patient shall have adequate opportunities for toileting and personal hygiene.

8. Potentially dangerous personal articles (shoelaces, belts, sharp objects, etc.) shall be removed before the patient is placed in seclusion.

The patient and, if possible, the patient's family/guardian participate in a debriefing with staff members who were involved in the episode of restraint or seclusion. The debriefing should occur with staff members involved in the incident as soon as possible, but no longer than 24 hours after the episode.

The seclusion room shall have an outside window and shall be free of environmental objects that can be used to induce bodily harm.

The seclusion room shall have an inside window so that the patient can be observed in any part of the room.

All windows shall have unbreakable glass or shall have adequate protective screens.

The room shall have adequate ventilation and the temperature shall be maintained at comfortable levels.

Electric lights and outlets shall be placed or protected so that they are not accessible to the patient.

In the event that a death would result during a restraint or seclusion situation, CMS should be notified as soon as possible. A root cause analysis of this sentinel event would follow.

---

See also: **Nursing Service Policies & Procedures Manual:** *Restraint and Seclusion Guidelines*

See also: **Policy PC-02(a) (LRC) -** *Clinical Restraints*
      **Policy PC-04 (FMHS) -** *Assault Precaution-Administrative Security Procedure-FMHS*

Procedures specific to Forensic Mental Health Services for transporting a patient are defined in separate
      **Policy PC-03 (FMHS/SOS-R) -** *Transport Restraint - FMHS/SOS-R*

---

## PATIENT/RESIDENT RIGHTS AND PRIVILEGES

1. To have private visits from your lawyer, doctor, or clergy at reasonable times.

2. To talk in private to other people, either face-to-face, or by telephone.

3. To correspond by sealed mail with officials of the Nebraska Department of Health and Human Services, your lawyer, or a court.

4. To send or receive mail without censorship.

5. To have humane care and treatment.

6. To make treatment decisions for yourself unless someone else has been legally appointed to do so.

7. To have safe and clean housing.

8. To have the opportunity for religious worship.

9. To receive prompt evaluation, care, and treatment.

10. To have you and your family/significant others involved in treatment decisions.

11. To be treated with respect and dignity.

12. To participate in any research only with your consent or the consent of the person legally authorized to act for you.

13. To have your private doctor examine you at your own expense.

14. To be evaluated and cared for in the least restrictive place.

15. To write a written complaint.

16. To have nourishing, well-balanced meals and clinical assessment of your dietary needs/risks.

17. To be free from abuse or neglect.

18. To participate in any questions or discussions related to your treatment.

19. To have your records kept confidential.

20. To refuse treatment.

21. Unless otherwise stated by law, to have the same legal rights and responsibilities as any other citizen.

22. To be admitted to programs/services regardless of your race, gender, religion, national origin, disability, age, sexual orientation or personal values/beliefs.

23. To wear your own clothes and use your own personal things.

24. To have access to spending money.

25. To have visitors at reasonable times.

26. To use the telephone at reasonable times.

27. To see your records.

28. To have physical exercise and outdoor recreation.

29. To have access to current newspapers, magazines, and radio and television programming.

30. To be free from physical restraint, seclusion, or isolation.

**_NOTE:_**

**_ANY OF THESE RIGHTS AND PRIVILEGES MAY BE LIMITED. DECISIONS WILL BE MADE BY THE TREATMENT TEAM BASED ON INDIVIDUAL ASSESSMENT, YOUR PERSONAL SAFETY, AND THE SAFETY OF OTHERS._**



Attachment to
LRC Form 0-3A-1
(Rev 02/02)

# LINCOLN REGIONAL CENTER

Administrative Policies and Procedures

**Policy  RI-12 (LRC)**

| | | | |
|---|---|---|---|
| **Original Effective Date:** | November 1985 | **Position Accountable:** | Program Directors / CEO |
| **Latest Review Date:** | July 2006 | **Approved By:** | _____ William Gibson, CEO |
| **LATEST REVISION DATE:** | July 2006 | *(Original signed policy on file in LRC Administration.)* | |

# PATIENT GRIEVANCES

## POLICY:

To establish procedures for RESOLVING grievances filed by patients. A grievance is a written expression of a complaint against or dissatisfaction with an action taken by the Lincoln Regional Center, including those actions which, in the opinion of the patient, violate the patient's rights afforded by the conditions of residency at or admission to the Lincoln Regional Center.

## PROCESS:

A.   A patient or his/her legal guardian shall file a written grievance to the Program Director, or his/her designee, within 30 days of the occurrence of the action grieved. The Program Director (or designee) shall contact or meet with and respond to the patient within seven (7) working days from the date the grievance was received. The written grievance, along with the written response, shall be forwarded to the Chief Executive Officer. The Health Information Management (HIM) staff will keep a copy of the grievance on file in the patient's unit.

   1.   When the Lincoln Regional Center is requested to transmit a grievance document, this will be done without alteration, interference or delay.

   2.   The Lincoln Regional Center shall not subject a patient to any type of disciplinary action or other adverse action as a result of his/her filing a grievance.

   3.   A supply of grievance forms (including a list of Patient/Resident Rights and Privileges) for use by patients shall be maintained by the Health Information Management (HIM) staff in each program. Forms are also available on the S-Drive for staff to print.

B.   If the patient/family is not satisfied with the resolution, he/she may re-submit the grievance as an appeal to the Chief xecutive Officer of the Lincoln Regional Center. The Patient Advocacy Director will meet with the patient/family member and respond in writing to the patient/family member within nine (9) business days of receipt of the appeal. Copies of this resolution will be sent to the Program Director/designee and to the Chief Executive Officer. This time period may be extended by the Chief Executive Officer when additional time is necessary for adequate investigation, provided prior approval is granted by the Nebraska Health and Human Services System and the patient is notified in writing of such extension. If no resolution can be agreed upon, the Chief Executive Officer will then provide a written response within nine (9) business days from the date received.

*D*

# PATIENT GRIEVANCE PROCEDURE          Policy **RI-12 (LRC)**

C.    A patient who wishes to appeal the action taken by the Lincoln Regional Center Chief Executive Officer shall do so to the Deputy Director, HHS Behavioral Health Division. The appeal may include any additional information as deemed necessary by the patient.

    1.    When the Lincoln Regional Center is requested to transmit an appeal, this will be done without alteration, interference or delay.

    2.    A grievance appeal form is used by the Chief Executive Officer when responding to a patient's appeal of the Program Director's resolution to his/her grievance. Use of this same form is continued if the patient wishes to appeal the Chief Executive Officer's decision to the HHS Behavioral Health Administrator.

D.    Program Directors, Risk Manager, and Patient Advocacy Director or Designees meet regularly to review grievances, the grievance process, and to provide oversight of the grievance process. A quarterly report of the information reviewed will be provided to the Governing Body.

## PROCEDURE:

    1.    Health Information Management (HIM) Staff are to ensure proper amounts of Patient Grievance Forms and envelopes are available in each area. These items are to be stored above the Patient Grievance Lock Box. Grievance forms are also available on the S-Drive for staff to access.

    2.    The Health Information Management (HIM) staff in each program will check the Patient Grievance Lock Box daily, Monday through Friday (excluding holidays).

    3.    Completed Patient Grievance Form information will be logged daily, Monday through Friday, into the Patient Grievance Spreadsheet. Once the information is entered, the original grievance form is forwarded to the Program Director/designee.

    4.    The staff reviewing the grievance with the patient will return the signed form to the Program Director within seven (7) business days from receipt of the grievance.

    5.    Using the Patient Grievance Spreadsheet, the Health Information Management (HIM) staff will enter the date the grievance was reviewed with the patient as well as the date the grievance was sent to the CEO's Administrative Assistant. The Health Information Management (HIM) staff will keep a copy of the grievance on file in the program.

    6.    The Health Information Management (HIM) staff will send the original signed form to the CEO's Administrative Assistant for processing.

    7.    The CEO's Administrative Assistant will send a copy of any grievances being appealed to the Patient Advocacy Director for follow-up. The Patient Advocacy Director will then meet with the patient and respond in writing to the patient/family member within nine (9) business days from receipt of the appeal. A copy of this response will be sent to the CEO's Administrative Assistant.

# PATIENT GRIEVANCE PROCEDURE                    Policy RI-12 (LRC)

8.    Should the patient disagree with the resolution from the Patient Advocacy Director, the Chief
      Executive Officer will then respond in writing to the patient.

9.    The patient can appeal to the HHS Behavioral Health Administrator.

---

**NOTE:  Every patient shall be informed of the Patient Grievance Procedure upon admission. The
Patient Grievance Procedure shall be posted in each program so that it is readily accessible to all
Patients.**

---

**See Also R1-01 Patient Rights**

---

LRC Form 0-3A-1
(Rev 02/02)

## LINCOLN REGIONAL CENTER
## PATIENT/RESIDENT GRIEVANCE FORM
(Refer to LRC Policy II-A-19)

Form to be used for alleged violations of patient/resident rights.

**NOTE:** Additional pages may be used as needed for each area below.

Person filing grievance:                           Facility/Program:

List number(s) related to right(s) or privilege(s) allegedly violated *(see attached)*:

My grievance is *(include witnesses, dates/times, and all supporting evidence)*:

I would like my grievance resolved in the following manner:

I believe that the above facts are true and correct.

Signature of grievant:_____ Date:_____

*\*\*Completed form should be forwarded to Nurse Supervisor, Nurse, Program Manager, ADON, or Program Director.*

| The grievance is resolved as follows: | | | | |
|---|---|---|---|---|
| | | | | |

Signature of Program Director or Designee:_____ Date:_____

| | | | | |
|---|---|---|---|---|
| The above resolution was explained to me | ☐ | Yes | ☐ | No |
| I wish to withdraw the grievance | ☐ | Yes | ☐ | No |
| I agree with the resolution | ☐ | Yes | ☐ | No |
| I disagree with the resolution, but choose not to appeal | ☐ | | | |
| I wish to appeal the resolution to the CEO | ☐ | Yes | ☐ | No |

Reason for appeal *(please be specific)*:

Signature of grievant:_____ Date:_____

*\*\*If grievance appealed, this form should be immediately forwarded to the CEO.*

(From LRC Policy II-A-19 – *PATIENT GRIEVANCE PROCEDURE*):

If the patient/family is not satisfied with the resolution, he/she may re-submit the grievance as an appeal to the Chief Executive Officer of the Lincoln Regional Center, or his/her designee, who shall conduct a review of the action grieved, prepare a written report containing the results of the review and proposed resolution, and provide a written response to the grievant within 13 days of receipt of the appeal. This time period may be extended by the Chief Executive Officer when additional time is necessary for adequate investigation, provided prior approval is granted by the Nebraska Health and Human Services System and the patient is notified in writing of such extension.

A patient who wishes to appeal the action taken by the Lincoln Regional Center Chief Executive Officer shall do so to the Deputy Director, HHS Behavioral Health Division. The appeal may include any additional information as deemed necessary by the patient.

1.      When the Lincoln Regional Center is requested to transmit an appeal, this will be done without alteration, interference or delay.

2.      A grievance appeal form is used by the Chief Executive Officer when responding to a patient's appeal of the Program Director's resolution to his/her grievance. Use of this same form is continued if the patient wishes to appeal the Chief Executive Officer's decision to the Deputy Director, HHS Behavioral Health Division.

LRC Form 0-3A-1
(Rev 02/02)

## TRAUMA SYMPTOM ASSESSMENT PROTOCOL
## LRC PSYCHOLOGY SERVICE

Purpose: This document outlines screening and testing procedures utilized by LRC psychology staff members to identify patients who have experienced trauma(s) and who may require treatment services to address trauma-related mental health issues.

Within 10 working days from the time of admission, the initial psychological assessment is completed. All patients will receive a trauma symptom assessment by the psychologist or designee (e.g., extern supervised by psychologist).

Procedures: Any of the following inventories or psychological instruments may be utilized when assessing for the presence or absence of trauma related symptoms. Testing will often be utilized with a consumer, but is not a requirement with every assessment.

Life Incidence of Traumatic Events
Millon Adolescent Clinical Inventory
Symptom Checklist-90-R
Trauma Symptom Checklist for Children
Minnesota Multiphasic Personality Inventory-Adolescent Version
Personality Assessment Inventory
Clinician-Administered PTSD Scale
Trauma Symptom Inventory
Millon Clinical Multiaxial Inventory-III
Minnesota Multiphasic Personality Inventory-II

Protocol updated 5-6-02
Updated 6-17-02
Updated 8-12-02
Updated 11-16-06

Daniel Ullman, Ph.D.

E



# The Mandt System®

Putting People First

**Section 2**
**Conceptual Skills**

Chapter 4: Trauma Informed Services
Chapter 5: Behavior Support
Chapter 6: Liability and Legal Issues
Chapter 7: Medical Risk Factors

Conceptual

F

# Section Introduction – Conceptual

As stated earlier, building healthy relationships is the ultimate goal of The Mandt System®. We want to look at all relationships present in the workplace, and not just focus on relationships with the customers, clients, students or whatever other name is used to describe the group of people receiving or purchasing goods and services from your organization. Once healthy relationships have been established, there are three core competencies we want to give you so you can not only build healthy relationships but also use skills to address conflicts and meet unresolved needs.

The **Conceptual** chapters now focus on using skills and competencies. We will carry with us the three models of **Maslow's Hierarchy of Needs**, **Proactive Interaction** and the **Crisis Cycle** and add several additional models that will serve as tools that will empower people as they focus on **Trauma Informed Services, Positive Behavior Supports, Liability and Legal Issues** and **Medical Risks of Restraint.**

Chapter Four, **Trauma Informed Services,** was written to help you work better with people who have experienced significant and in many cases ongoing trauma. These are people who may have experienced some type of traumatic event that was a "one time" occurrence, such as a natural disaster. Or they may have been victimized by other people: terms like abuse, exploitation, dehumanization, degradation can best describe what has happened to these people.

At a **conceptual** level, we want to give you the background information that may be helpful to you in the role you have with this person. *If you are not already a therapist, this information will not make you a therapist.* The information being given here will not make you a clinician, but it may help you to become more aware of the effects of trauma on the people you serve, and provide a safer environment in which they can live, learn, work, and play with an increased feeling of safety. It may also give you the ability to support people and to respond to them in ways that do not retraumatize them.

Remember that injury does not have to be physical. As children, many of us said, "Sticks and stones will break my bones but words will never hurt me." Truth be told, most of us were wounded far worse by words than any stick or stone that could be hurled. In the first section, you were introduced to the concepts of Interactions, Incidents, and Crises. The intention of The Mandt System® is to give you the tools needed to keep interactions at the interaction level. *These next three chapters are aimed at what to do when an interaction may become an incident.*

Chapter Five, **Positive Behavior Support,** was written to help people implement behavior support plans, not to write them. The more people know about positive behavior support and the reasons behind how a plan is written, the easier it will be to help the people writing those plans by giving them the information they need, and the easier it will be to implement the plans once they are written.

Chapter Six, **Liability and Legal Issues,** provides an introduction to the legal issues surrounding the provision of services to people in educational, developmental disabilities, mental health and substance abuse, and other human services settings. Since none of us are attorneys, we cannot give legal advice, but we can give legal education by sharing the knowledge we have gained through the use of our skills and competencies as administrators, educators, social workers, expert witnesses, and direct support professionals.

Chapter Seven, Medical **Risks of Restraint,** was written to provide an overview of the risks of physical restraint, using literature written by medical professionals. None of the authors of this chapter are licensed medical professionals. If you have any concerns about the health and welfare of people, whether people who receive services or people who give services, seek the advice of a licensed medical professional.

David Mandt and Associates has collected literature and experience over the past 30 years in the development of the physical techniques used in the training. We are especially concerned with the prevention of restraint related deaths. Restraint related death can be prevented. **We require that everyone who uses the technical (physical) skills in the Mandt System must complete this Chapter prior to being trained in any of the Technical Chapters.** We also strongly recommend that everyone who is trained in the physical techniques of the Mandt System also have First Aid and CPR training.



# The Mandt System®

Putting People First



**Section 2**

Conceptual Skills

Chapter 4: Trauma Informed Services

# Table of Contents –Trauma Informed Services

SECTION INTRODUCTION – CONCEPTUAL ............................................................. 107

TABLE OF CONTENTS –TRAUMA INFORMED SERVICES ....................................... 111

INTRODUCTION.......................................................................................................... 112

TWO MODELS TO UNDERSTAND TRAUMATIC STRESS......................................... 114

RESPONDING TO ACUTE EPISODIC TRAUMA........................................................ 117

SUPPORTING STAFF................................................................................................. 121

THE EFFECTS OF TRAUMA – INTERPERSONAL VIOLENCE: ................................. 122

POSSIBLE EFFECTS OF RESTRAINT....................................................................... 127

CONCLUSION ............................................................................................................ 131

GLOSSARY OF TERMS.............................................................................................. 132

SELF STUDY QUESTIONS......................................................................................... 133

REFERENCES ............................................................................................................ 133

# Introduction

Trauma can affect anyone. Almost all people have experienced the loss of a loved one, and the intense grief that often accompanies death. Many people have had the experience of being in a tornado, hurricane, flood, or earthquake. We have all experienced loss throughout our lives to one degree or another; it is part of being human.

You, the reader, are taking a class in The Mandt System®. You are working with and for people who need something you can offer as a teacher, social worker, direct support professional, therapist, mental health technician, or any of the literally thousands of titles describing the work people do as a service and support for other people.

**Our Purpose**

This chapter is to help you work better with people who have experienced significant and in many cases, ongoing trauma. These are people who may have experienced some type of traumatic event that was a "one time" occurrence, such as a natural disaster. Or they may have been victimized by other people: terms like abuse, exploitation, dehumanization, degradation can best describe what has happened to these people.

This information is being shared with you at a **conceptual** level. We want to give you the background information that may be helpful to you in the role you have with this person. *If you are not already a therapist, this information will not make you a therapist.* The information being given here will not make you a clinician, but it may help you to become more aware of the effects of trauma on the people you serve, and provide a safer environment in which they can live, learn, work, and play with an increased feeling of safety. It may also give you the ability to support people and to respond to them in ways that do not retraumatize them.

## Acknowledgements

Many people offered suggestions in the development of this chapter, and we want to acknowledge the contributions of the members of the Advisory Committee to David Mandt and Associates, who contributed a number of helpful comments as they reviewed this chapter. We also want to thank June Phelps, Ph.D., a child psychologist in Canton, Ohio, who reviewed the material and provided training to the members of the Training Faculty in the area of trauma.

After the devastation of Hurricane Katrina, we were privileged to provide this training to the therapists and case managers of mental health centers in Tupelo, Hattiesburg, and Gulfport, Mississippi. Their comments and suggestions were incorporated into the material and has made this chapter more relevant to people who have may have had similar experiences.

## Learning Objectives

By the end of this chapter, students will be able to:

1. Identify the effects of trauma on people.

2. Differentiate between two types of trauma.

3. Respond to people in ways that support them as they deal with the effects of trauma.

4. Prevent possible retraumatization by avoiding the use of specific interventions.

5. Participate with individuals served to design interventions that are supportive

6. Choose supportive interventions which support the whole person, not just focusing on their specific behaviors in response to the trauma.

## Preparation for Discussion

How do you respond to these words:

Lockerbie – Tsunami – 9/11 – Challenger – Hurricane – Air India?

These questions demonstrate the power of trauma. Almost all Americans over the age of 18 can tell you where they were and what they were doing on 9/11. For this generation, 9/11 had a similar impact to the assassination of President Kennedy to one generation, and Pearl Harbor to another. Think about the feelings you had when these events occurred, and imagine the feelings of people who have experienced and/or continue to experience trauma on an ongoing basis. The December 2004 tsunami likewise had a powerful impact around the world, as did the recent hurricane Katrina.

As you learned in the first chapter, *Building Healthy Relationships*, stress can cause people to change their behaviors and enter the Crisis Cycle. There are many different types of stress and not all of the stressful events people experience result in a sense of trauma for them. In the same way, what may be a low level stress for you may be perceived much differently by others.

NOTES:

# Two Models to Understand Traumatic Stress

There are two types of trauma we want to address. The first is the result of "acute episodic trauma" which is defined as a life-threatening event that occurs to individuals or to an important other, over which they have no control, and is often, though not always, the result of natural disasters. The stress people feel as a result of this type of event can last up to one month without meeting the criteria for post-traumatic stress disorder (PTSD) (Phelps, 2005)

The second type of trauma is usually the result of "interpersonal trauma." It is more narrowly defined by The National Association of State Mental Health Program Directors (NASMHPD) has defined as:

> **"the personal experience of interpersonal violence including sexual abuse, physical abuse, severe neglect, loss, and the witnessing of violence."** (NASMHPD, 2005)

What we are going to focus on in this chapter is how to work with people who have experienced acute episodic stress, and people who have experienced trauma resulting from interpersonal violence. **Trauma Informed Services** is a more accurate description of the material presented in this chapter. As Roger Fallott has said, "Trauma-Informed Services - incorporates knowledge about trauma, prevalence, impact, and recovery in all aspects of service delivery. [It] Minimizes revictimization and leads to services that are hospitable and engaging to survivors." (Fallott, 2005) We will, in our training, review ways to support and facilitate effective recovery for trauma survivors based upon evidence of the effectiveness of the practices presented in this chapter.

This information is being presented as a way to train non-licensed staff, who often are in more frequent contact with trauma survivors than licensed staff, to offer supports and services in that:

1. Meets immediate needs for basic human needs and safety

2. Is sensitive to provide services and supports respectfully so as to not re-traumatize the person

3. Perceives responses to trauma as "normal responses to abnormal situations," to quote a commonly used phrase

4. Incorporates the experiences of individuals served into our interactions with them, whether those interactions are more informal or are directed by some type of specifically designed individual plan

The following material is adapted from The American Academy of Experts in Traumatic Stress (AAETS). (Lerner and Shelton, 2005) When people experience significant levels of stress and/or trauma, their responses can fall into one of the areas below. It is important to remember that we as staff may also have similar responses.

| Area | Individual Served | Staff Supportive Response |
|---|---|---|
| Physiological | People can be injured by the traumatic event, such as an accident, severe weather, abuse, or other significant events | Ensuring immediate physical safety is critical. Use the skills taught in First Aid, CPR, call 911, etc. |
| Emotional | Feelings such as hopelessness, helplessness, panic, severe anxiety, irritability, or "emotional numbness" can occur.   Different people will probably react differently; people normally very active can become depressed and withdrawn while people normally very calm and cool can become "hyper". | Remaining calm is one of the best things you can do.  You will need to affirm your feelings and then choose your behaviors.  As the staff person, you will need to make sure to manage your own behavior; this provides a calm, safe setting and teaches others how to handle stress in the future (Chapter 1) |
| Psychological | Some of the people you serve may be affected by mental health needs such as schizophrenia, borderline personality disorder, etc.  Severe stress or trauma may exacerbate pre-existing conditions. | Follow the guidelines and treatment plans provided by the clinically qualified staff.  If you are working with someone who does not have a therapist/counselor, you may need to refer the individual for services. |
| Cognitive | Under stress, people may have shorter attention spans, increased activity levels, and short term memory impairment.  Neurologists say we can hold between 3-7 things in short term memory; under stress those numbers decrease. | One of the best things we can do as staff is to lower task expectations, and take away as much stress as possible.  Accept the fact that people will be able to accomplish less when they have more stress.  Give memory aids such as breaking tasks down into smaller steps |
| Spiritual | After 9/11 there was a significant increase in attendance at places of worship of all faiths.  Some people may turn to their faith while others may turn away as a result of the stress and/or trauma. | Be sure to support the person and not impose your own approach to the question of spirituality.  Do not try to convince them that their answers are wrong, and if they question why this happened, the most honest answer is "I don't know." |

The staff of three mental health centers in Mississippi (Gulfport, Hattiesburg, and Tupelo) recommended a list of helpful "Do and Don'ts" responses based on their experiences after Hurricane Katrina:

| DON'T | INSTEAD |
|---|---|
| Don't say "It'll be alright". | Listen to feelings, let them know you will do your best to keep them safe |
| Don't point fingers or lay blame on others when there are problems. | Keep other team members and other people helping informed. |
| Don't criticize others, we are all doing the best with what we have. | Address rumors quickly, they are fear based, give facts when known. |
| Don't ignore immediate needs. | Provide linkages to other resources. |
| Don't panic. | Model calm behavior. |
| Rush, over react or be irrational. | Put "turf" issues aside, collaborate! |
| Don't just say "I don't know" and walk away; | If you don't know, offer ways to find out. |
| Don't over promise | Promise what you know you can deliver. |
| Don't minimize the losses people feel, it is their loss, not yours. | Acknowledge your own feelings. |
| Don't be judgmental and close minded. | Be flexible. |
| Don't take things people say personally, "It's not about you!" | Do what you can. |
| Don't assume others feel what you are feeling. | Have clear policies in place prior to acute episodic trauma. |
| Add your own suggestions below. | Be clear about what you expect and need and what others expect and need. |
| | Establish safety for people, especially children, as quickly as possible. |
| | Add your own suggestions below. |
| | |

# Responding to Acute Episodic Trauma

The majority of the people your agency or organization serves, and almost all of the staff, will one day experience or already have experienced Acute Episodic Trauma. This is the kind of stress that comes from common human experiences. "*Although most people have a strong, initial reaction after an acute episodic trauma (e.g., high levels of fear) most people do not develop a psychological disorder such as posttraumatic stress disorder or major depression. Factors that influence whether a person will develop a psychological disorder after an acute trauma include: prior history of trauma, the nature of the traumatic experience (e.g., did anyone get physically injured), and the nature of the recovery environment (e.g, degree of social support).* (Phelps, 2005)

The American Academy of Experts in Traumatic Stress (AAETS) (http://www.aaets.org) uses a three-pronged strategy to respond to stress: **Prepare, Stabilize,** and **Recover.** This is an excellent strategy to address those traumatic events that can occur within your organizations, such as:

Serious injury or death of individuals served and/or staff

Serious abuse and/or neglect

Automobile accidents

Traumatic events in the area in which you live (tornado, flood, hurricane, etc.)

Death or serious illness of a parent or other close relative of individuals served

Criminal acts of a random nature (drive-by shootings) and other forms of terrorism

The approach used by AAETS is called *Comprehensive Acute Traumatic Stress Management*. Resources from AAETS are included on the CD-ROM you received as part of this training. Episodic trauma can have serious effects on people, although most people are resilient and do not develop Post Traumatic Stress Disorder (PTSD) However, this kind of stress must be addressed, and following is a synopsis of the ten steps recommended by AAETS to address Episodic Trauma.

## Preparing:

Acute episodic trauma is faced by a majority of human beings at some point in their lives. In human services, this is even more true, given the types of services offered, the experiences of the individuals using those services, and the environments in which many of us work.

Preparing for the eventually of acute episodic trauma is, we believe, the responsibility of every organization. On the CD-ROM accompanying this manual, there is more detailed information on this topic. **Preparing for acute episodic trauma is a management responsibility,** and as such will not be covered in depth in this chapter.

## Stabilizing:

Part of the work that we do as human service professionals is to walk through the experience of acute episodic stress with the person. We learned in Chapter 1 (Building Healthy Relationships) that when the people we serve experience stress, we will be experiencing similar stresses.   Our responsibility, then, is to manage our own behavior and to practice the principle of "Respond, Don't React" to the stresses we encounter.

As stated in Chapter 1, when we respond, we affirm our emotions and choose our behaviors. We also provide a safe haven for those around us, by the simple fact that we are acting in as calm a manner as possible. We are also teaching others how to respond to future stress by the way we respond to the present stress.

Stabilizing a situation and the people involved and affected by the acute episodic trauma requires that we first deescalate ourselves. We are going to have emotional responses to the stresses at hand; we are human and will have a range of emotional responses. To help other people, though, we need to deescalate ourselves so that we can provide the stability others need and expect from us in our roles within the organizations within which we work.

When people are experiencing acute episodic trauma, we need to "be there" for them. What this means is that we will walk side by side with them, holding their hands figuratively, if not also literally. Many people, when they reflect back on their own stresses, say that the most helpful intervention was having a friend who was simply there, and who in some cases said very little. By their physical presence, they provided stability, safety, and the promise that they would be there for them in the future.

As we stabilize a situation, we need to use the tools provided in Chapter 1 – focus on their basic human needs first (Maslow), keep your RADAR on to be aware of any unmet needs, and know where they and you are in the Crisis Cycle.

Remember that RADAR stands for:

Recognition - recognizing that something is going on, using all your senses.

Assessment - assessing what is happening to everyone, starting with yourself.   Assess the environment as well.

Decision- deciding what to do after you have recognized and assessed.

Action - actions take the form of a verbal response (not a reaction), a generalized physical response, or a specific physical response.

Results – results are now evaluated.  Did you achieve the goals of your action(s)?  If not, what is your next step?

When you are working with people, you want to keep your RADAR on! The earlier you can intervene, the better chance you have of preventing interactions from becoming incidents, or incidents from becoming crises!

We want to use the RADAR model, Maslow's Hierarchy of Needs and the Crisis Cycle model as we review the 10 steps in the **Comprehensive Acute Traumatic Stress Management (CATSM)** model developed by AAETS. It is important to remember that this is a model to guide staff interaction, and often may not flow in a linear fashion. The steps in the model are identified in **bold**:

1. The first thing to **ensure** is the **physical safety** of all people, including yourself. If you are not safe, consider whether or not it is appropriate for you to begin intervening.

2. Assess the **mechanisms of injury**. CPR and First Aid training both provide excellent structures for assessing physical injuries. Pre-existing health conditions are risk factors in times of acute episodic trauma.    Remember to **assess psychological and emotional injuries as well.** If there is any concern about psychological and emotional injury to the individual, refer them to a licensed mental health practitioner!

3. **Evaluate** the level of **responsiveness of the individual(s)**, keeping in mind the baseline behavior (chapter 1) of the individual. Some people are active in Phase 1, while others are quiet and subdued in phase 1.

4. **Address medical needs** immediately before moving on.

Key points in the first four steps include:

- Follow the policies and procedures in your organization which address situations of extreme stress, such as tornadoes, hurricanes, floods, fires, etc.

- Follow the lead of clinical staff when responding to serious illness or death of family members, staff, etc.

- Follow policies and procedures as well as local, state and federal law when responding the issues which may involve abuse and neglect

- Always treat people with dignity and respect

## Recovery:

The next 5 steps in the AAETS model of CATSM fall in the recovery phase of the model.

Our purpose in helping people to recover from the effects of the acute episodic stress is to support them to return to their baseline behaviors or "personal best." This will mean listening to the facts and the feelings that people share with you. To do this you will need to use the tools of . . .

    A. Active Listening (chapter 2)

    B. Reflective Listening (chapter 2)

    C. Perception checking (chapter 3)

    D. Building empathy (chapter 3)

. . . as you help the person to recover from the event.

5. **Observe and identify** who may have been affected by the traumatic event. Remember that people who were not directly involved may still be affected by the traumatic event.

6. **Connect with the individual** by using their name (chapter 2) and introducing yourself, if you are not known to them. Be sure to respect their need for space or closeness (Proxemics, chapter 2), and assess how close or far away you need to be to maintain your safety.

7. **Ground the individual** by listening to the facts and the feelings they are sharing in both their verbal and non-verbal communications (chapters 2 and 3). Remember to make sure you know the facts surrounding the incident, and do not argue with them or tell them that their perception of what happened is wrong. This is their stress, not yours! Use active listening skills to really hone in on the facts, and reflective listening skills to hone in on the feelings, and to be authentic (chapter 3) in your communication. It is important to reestablish routines as quickly as possible, remembering that safety is the result of consistency and predictability.

8. **Provide support** to the individual, building on the empathy developed in step 7. One mistake people sometimes make is to tell people they know exactly how they feel (chapter 3), while another is to tell people what they should or should not feel (chapter 1). Remember, you are supporting the individual who has experienced acute episodic stress. It is their stress, not yours! If they feel something you do not, your job is not to figure out why, but rather to support them as people.

Steps 5, 6, 7, and 8 in the CATSM model focus on specific ways to build a relationship with the individual and walk with them to assist them to de-escalate. Remember to use the concepts discussed in chapter 1 to ensure that:

- Their needs are met (Maslow)

- External or internal stimuli are addressed on a timely basis (keep your RADAR on!)

- You have an awareness of where you and they are in the Crisis Cycle

- Keep in mind the RADAR (Proactive Interaction) model:

9. Now you are ready to help them by **normalizing the response.** Many people, when they have gone through an acute episodic trauma feel that their responses were somehow "wrong" or that they were "different" from others. We emphasized in chapter 2 that emotions are not right or wrong, they are simply ours, and we need to empower people to feel their feelings, affirming that their responses were simply that – their responses. There may be a need to limit behavior for safety reasons. If people are acting on their emotions in ways that cause harm to others or themselves, then behavioral limits would need to be in place, using the skills taught in chapters 1, 2, and 3 to de-escalate their behavior. **Caution: If people are sharing information that indicates a high level of stress, thoughts of being hurt or hurting themselves, refer the individual to a licensed clinician.**

10. **Prepare for the future** – remember that unless you were a therapist when you came to this training, you will not be a therapist when you leave! This is not therapy; this is helping them develop a road map for what comes next for the individual, referring them to someone else for more specific services, dealing with the day to day choices that we all face after experiencing an acute episodic stress. People will need to move on from here. Your interactions with them may be very brief, or part of a long-term supportive relationship. Whatever your relationship is, we need to move on and help the person to move on from here.

## *Learning from the Past:*

When people have experienced acute episodic trauma, part of preparing for the future is learning from the past. People can not really process what to do "next time" until they have gone through the first 9 steps of the AAETS process. If there are things to be done differently, i.e. get a weather radio, respond quickly to evacuation suggestions, etc, then we want to help people to learn from the past. One helpful way to structure this is to use the approach known as "processing" (taught in Chapter 2), which is to say the decisions you made in the past were the best ones you could make at the time, given the information you had. The question is not "what did you do wrong," but rather "what worked, and what will we do differently in the future."

# Supporting Staff

There are many instances in which natural and man-made disasters affect entire cities, counties, states, provinces or even countries. In such cases, staff must make sure they take care of themselves as they prepare to take care of others. One of the statements we repeat often in The Mandt System® is "affirm your emotions, choose your behaviors." Practicing teamwork, supporting each other, and accepting support are all critical elements in supporting staff.

When responding to the stress of others, we may have emotions that are triggered in us. It is normal to experience this! We need to affirm these emotions, and then choose the behaviors that are most helpful to the people whom we are supporting. If there are situations where this is difficult, it is important to be honest about this, and to know our own limitations. We may do more harm than good if we are unable to affirm our emotions and choose our behaviors.

The National Center for Child Traumatic Stress has prepared a helpful monograph on this topic, which is included in the references section in the accompanying CD-ROM.

## Triaging Trauma – When Should Professional Help Be Sought?

Some of the people with whom you are working may be affected to a greater degree by the traumatic event, and need more support than most of us can offer. We again want to emphasize that this training will not make you a therapist or counselor. We do want to give you some things to look for in the behavior of people that may help you decide whether or not to refer this person to a clinically licensed professional such as a psychologist, social worker, counselor, psychiatric nurse, psychiatrist, or other licensed professional.

If there is any doubt in your mind as to whether or not a person may need to be assessed by a clinically licensed professional, we recommend you make the referral and allow this person to complete the assessment and provide the services and supports the person may need.

The following information comes from the American Psychological Association, and provides an excellent framework for making decisions about when to seek professional help from licensed mental health practitioners:

"Some people are able to cope effectively with the emotional and physical demands brought about by a natural disaster or other traumatic experience by using their own support systems. It is not unusual, however, to find that serious problems persist and continue to interfere with daily living. For example, some may feel overwhelming nervousness or lingering sadness that adversely affects job performance and interpersonal relationships.

Individuals with prolonged reactions that disrupt their daily functioning should consult with a trained and experienced mental health professional. Psychologists and other appropriate mental health providers help educate people about normal responses to extreme stress. These professionals work with individuals affected by trauma to help them find constructive ways of dealing with the emotional impact.

With children, continual and aggressive emotional outbursts, serious problems at school, preoccupation with the traumatic event, continued and extreme withdrawal, and other signs of intense anxiety or emotional difficulties all point to the need for professional assistance. A qualified mental health professional can help such children and their parents understand and deal with thoughts, feelings and behaviors that result from trauma."

Retrieved from http://www.apa.org/practice/traumaticstress.html September 14, 2005

We hope this short section on acute episodic trauma will provide staff within human services organizations the resources they need to better support individuals in times of acute episodic trauma. We are now ready to move to the next topic in this chapter.

# The Effects of Trauma – Interpersonal Violence:

In the previous section, we presented a model for working with people who experienced significant stress, when that stress was episodic, a one-time event. Remember that the definition of trauma is:

"the personal experience of interpersonal violence including sexual abuse, physical abuse, severe neglect, loss, and the witnessing of violence."

Again, we want to reiterate that not all people who are exposed to Adverse Childhood Experiences (ACE) develop behaviors that put themselves and/or others at risk. However, many of the people that are served in mental health, developmental disability, education and correctional programs have histories of exposure to ACE's. Restraint in and of itself is an adversive event.

The Centers for Disease Control (CDC) and Kaiser-Permanante Insurance in California (2003) studied over 18,000 adults who were followed for a period of 10 years, to look at the effects of Adverse Childhood Experiences (ACE) on adult behavior. Adverse Childhood Experiences were defined as **growing up (prior to age 18) in a household with:**

### Adverse Childhood Experiences:

Recurrent physical abuse.

Recurrent emotional abuse.

Sexual abuse.

An alcohol or drug abuser.

An incarcerated household member.

Someone who is chronically depressed, suicidal, institutionalized or mentally ill.

Mother being treated violently.

One or no biological parents.

Emotional or physical neglect.

The researchers then looked at the incidence of I.V. drug abuse, alcohol abuse, and suicide attempts. People who experienced four or more of the above ACE's had:

6 times the rate of I.V. drug use than those that had no ACE's

7 times the rate of alcohol abuse than those that had no ACE's

9 times the rate of attempted suicide than those that had no ACE's

Note: the above information was retrieved from http://www.acestudy.org/docs/GoldintoLead.pdf on May 25, 2005

In this chapter, we are going to be exploring ways to help you provide services and supports, based on evidence of effective practices, to the people with and for whom you work. In that sense, then, most of the people who will be using The Mandt System® will be providing non-clinical services in educational, residential, vocational, recreational, an correctional settings. Some of the people taking this course will be clinicians, and the information presented here may be dealt with in more depth in training received at a clinical level.

Many of the people whom you serve have experienced recurrent abuse, neglect, and other forms of violence when they were children. Some of them have continued to experience trauma as adults, while others experienced abuse and neglect as adults.

We can not go back and undo the past. But we can use what we know about the past histories of each of the people we serve to inform how we interact with them today and how we will interact with them in the future. We can use what we know to create individual plans for them, whether those plans are implemented in mental health, developmental disabilities, correctional, educational, or other settings.

This approach is known as Trauma Informed Services, which takes into account the trauma histories of individuals and incorporates that history into their plan, whether it is known as a treatment plan, recovery plan, habilitation plan, behavior support plan, rehabilitation plan, individual education plan, etc. If trauma histories are not taken into account; then whatever interventions are used to support the person may in fact re-traumatize the person.

While the ideas inherent in Trauma Informed Services grew out of services to people affected by mental illness, the model is applicable in all settings. Schools, group homes for people affected by developmental disabilities, special education programs, correctional programs, etc., all serve individuals who may have experienced significant trauma in their lives. In fact, with the exception of "regular educational services", most of the people served in your organizations will have been subject to trauma at a significantly higher rate than the general population.

"Study findings indicate that adults in psychiatric hospitals have experienced high rates of physical and/or sexual abuse, ranging from 43% to 81%. Other research recently has found that 92% of homeless women and 81% of non-homeless women in poverty had been physically and/or sexually abused." (Position Statement on Services and Supports to Trauma Survivors, retrieved from http://www.sidran.org/nasmhpd.html   August 25, 2005).   People affected by developmental disabilities have also experienced significantly higher rates of trauma.  Over 85% of children in Residential Treatment Centers have trauma histories. (CWLA, 2004)

In Chapter 1, we focused on Building Healthy Relationships, and shared quotes from Dr. Peter Breggin and David Pitonyak on the importance of healthy relationships in supporting people, not just their behaviors.  When working with and for people who have experienced significant trauma, relationships that engender trust and provide safety are even more important.

**The ACE Pyramid**



Source: http://www.nsvrc.org/about/cdc.html, retrieved May 25, 2005

**One Person's Experience:**

Amanda is a woman who experienced severe and repetitive abuse as a child, and developed what for her were adaptive behaviors which served to keep her safe but also resulted in harm to others. When people experience significant trauma early in life, the following diagram shows how they adapt to and are affected by the trauma:

Note the line on the left hand side shows the time period from conception to death. The earlier the abuse occurs in the life of the child, the more **disrupted neurodevelopment** may be.  A number of different studies have documented the neurological effects of stress on neurological development (Bremner, 1999, DeBellis, 1999).   One of Amanda's diagnoses was Partial Complex Seizure Disorder, which is found in about 30% of cases to be associated with a history of severe abuse (Gates, 2003). Other forms of disrupted neurodevelopment may include an increased level of neuro-hormones that prepare the body for fight or flight (or freeze), fragmented memories.   Individuals affected by PTSD have been shown to have a smaller hippocampus (memory) than people not affected by PTSD.  (Benner, 1997) (Phelps, 2005)

The next step in the pyramid are the **Social, Emotional, and Cognitive impairments** which occur next, as the child begins to interact with their environments and the people within them. Partly as a result of the disrupted neurodevelopment and partly as a result of the complex interplay between individuals and the environments in which they live, learn, work and play together, people develop social, emotional, and cognitive interaction skills which they use. In the chapter on Behavior Support, behavior is defined as the way in which we get our needs met, respond to the demands placed on us, influence our environments, and communicate with others.

One of the effects of trauma, then, is the development of behaviors which accomplish these things in ways that keep us safe. When we feel unsafe, we will do everything we can to either manipulate the people around us, or keep them at a safe distance physically, emotionally, or both. Amanda developed a set of behaviors which she said were chosen to keep people away from her. At the same time, though, she craved social relationships, and so at times she would want to get close, while at others she pushed people away. This is one of the hallmarks of Borderline Personality Disorder, another of Amanda's diagnoses. Amanda also has a diagnosis of Borderline Intellectual functioning, which many believe is attributed to her history of abuse.

The next stage in this model is the **Adoption of Health-Risk Behaviors,** which can be seen as attempts on the part of the individual to cope with the effects of the trauma they feel by escaping the pain through drug and alcohol use, engaging in abusive behavior themselves, and by attempting suicide. Again, Amanda had a history of substance abuse, suicidal thoughts, and homicidal thoughts.

As a result of the adoption of health risk behaviors, people who experience four or more ACE's are more likely to experience **disease, disability, and social problems**, finally culminating in **death**.

Amanda developed a series of behavioral responses to the trauma she experienced which kept people away from her. If they were far away both physically and emotionally, then she would be less likely to be hurt in the future as she had been in the past. The clinical term used to diagnose and describe her way of coping with this stress is Borderline Personality Disorder.

Many studies have found a high correlation between the diagnosis of Borderline Personality Disorder and traumatic abuse in women. (American Journal of Psychiatry, 1990; Goldman, et. al.; American Journal of Psychiatry, Shearer, et.al.; Correctional Service of Canada, 2004). Two studies have shown a correlation between the diagnosis of partial complex seizure disorder and histories of traumatic abuse (Epilepsy & Behavior, Gates, 2002; Medical College of Georgia, Murrow, 1997).

Amanda has some advice for people whose job it is to support others, especially when there is a history of trauma involved. **Her advice is**:

Listen to us! I tried for years to tell people that I did not feel safe. Because I could not always put my feelings into words, I talked through my actions. You know that anger is a feeling that always comes after other feelings, but all people ever did was deal with my anger. Listen to the people you serve! Listen to their behavior, and if they are angry, find out why!

Don't hurt us! People hurt my wrists when they restrained me standing up, and it was even worse when they restrained me on the floor; it felt like I was being raped again and again. When I hurt other people, I never meant to hurt them, but I could not control myself.

Give us space! When people are angry, most of them want space, I never wanted people to be right next to me, but that is where they were! And the closer they got to me, the more I wanted to hit them because I was afraid they would hurt me.

Give us time! I ran away from lots of different homes, because I wanted time to blow up and then cool off. But people never gave me the time until LifeShare (the company that serves Amanda). They wrote a plan for me that said if I ran away they would not follow me, and if I did not come back in a certain time, they would call the police.

If you have to restrain people, tell them what you are doing and why. Sometimes people did not do that, they just restrained me and I did not know what they were doing, and it made me even more scared.

## Trainer Tip:

*If you are working with an individual who has experiences similar to Amanda's, use that person's stories. Talk with them ahead of time, and put together a handout to accompany this manual, with statements from this person. If they are willing and feel comfortable, include them in the training. First person stories have a tremendous impact and can help people better understand why restraint is such a traumatic experience for many people.*

In 2004, Amanda, Bob Bowen, and David Mandt went to a TASH conference in Reno, Nevada, along with two of the staff from the company which provided supports to Amanda, LifeShare, Inc. She is now living in New Hampshire with no residential supports at all! She does receive some vocational supports, and is doing very well. The secret to her success was the healthy relationships formed with her by the staff of Lifeshare, Inc., and a positive behavior support plan that was focused entirely on one antecedent: keeping herself safe.

NOTES:

# Possible Effects of Restraint

We want to thank Kevin Ann Huckshorn and the National Technical Assistance Center for allowing us to utilize their material in this section.

The trauma experienced by people who were abused by the very people who were supposed to protect them can be devastating. There is an inherent fear that this will happen again, at the same time that there is a continuous hope that these people will somehow change, will somehow become the caring, nurturing people they are supposed to be.

For people who have experienced significant trauma, these feelings flood back into them at times when they have been restrained. A number of different studies have demonstrated that when people who have been traumatized are restrained, they are retraumatized. Some of them felt they were being punished, while in other situations they were confused by staff use of force, as these were the staff that just earlier had supported them positively. Others did not feel protected from harm, while some had feelings of bitterness and anger 1 yr later. *(Wadeson et al., 1976; Martinez, 1999; Mann et al. 1993; Mohr, 1999; Ray et al., 1996)*

One of the concepts discussed in Chapter 1 and presented in this chapter is the Crisis Cycle. People who have experienced significant trauma may have different "triggers" that move them from their baseline to the higher phases of the Crisis Cycle. It is important to understand two concepts:

1. People who have been traumatized will have a higher baseline; they are in continual states of hypervigilance, always on the lookout for things that could cause them harm.

2. Because of their hypervigilance, when they experience triggers, the behaviors they use in response are designed to maintain their own safety, and they will use those behaviors swiftly and with great force. As a result, they may appear to be angry and aggressive when in fact they are fearful and hurt.

Some of the triggers that may cause this quick escalation of behavior are:

| | | |
|---|---|---|
| Not being listened to | Lack of privacy | Feeling lonely |
| Darkness | Being teased or picked on | Feeling pressured |
| People yelling | Room checks | Loud noises |
| Being isolated | Being touched | Other (describe) |
| Not having control | Being stared at | |

It is important to remember the model of the Crisis Cycle, and understand that when these triggers are experienced by people who have been severely traumatized, they will use behavior in some way to keep themselves safe. Many people display indicators that they are in a position where they may lose control. In Crisis Cycle terms, these are the transitional behaviors between phase 0 (baseline) and phase 2 (escalation), and people are asking for help. Some of these behaviors include:

| | | |
|---|---|---|
| Clenching teeth | Crying | Giggling |
| Shaking | Singing inappropriately | Pacing |
| Heart pounding | Breathing hard | Shortness of breath |
| Clenching fists | Loud voice | Rocking |
| Can't sit still | Swearing | Restlessness |
| Wringing hands | Bouncing legs | |

The strategies to use with people will vary from person to person. It is recommended that you get to know the person during the baseline phase, and actually baseline the behaviors in which they engage when there is little or no stress. These are "self-reinforcing behaviors" and can be used in the redirection or channeling feelings into activities strategies described in Chapter 2. Using a de-escalation preference tool can and should be a part of this process. **By using this approach, you may be able to help the person minimize the retraumatization which might otherwise occur.**

Another way to develop this list of strategies is to focus on safety. Ask people what helps them to feel safe. Some of the answers given to staff of the National Technical Assistance Center were:

- Time alone                    Therapeutic Touch, describe _____
- Exercising                    Eating
- Writing in a journal          Taking a cold shower
- Listening to music            Talking with staff
- Molding clay                  Calling friends or family
- Reading a book                Pacing
- Coloring                      Hugging a stuffed animal
- Taking a hot shower           Deep breathing
- Being left alone              Talking to peers

There are responses staff may give which **may not helpful to people**. Some of those responses are:

| | |
|---|---|
| Being alone | Humor |
| Having many people around me | Staff not taking me seriously |
| Not being listened to | Being told to stay in my room |
| Loud tone of voice | Having space invaded |
| Peers teasing | |

Notice that some of the responses on this list are also on the list of helpful responses. The responses must be individualized as different people will probably have different responses and different needs for support. In order to be help people understand what may or may not help to provide safety and support, a de-escalation preference tool can provide the information needed to individualize responses.

The tool may reveal comments such as "I like to take medication only by mouth" or "the best way to support me when I am not feeling safe and may hurt myself or others is to give me a shot." Some eople may be able to tell you what medication they prefer, or if they prefer to have male or female staff work with them. You may also be able to help people identify how to best help them when restraint is necessary by asking if the person would rather have their hands held instead of a complete restraint. It is also important to consider racial, cultural, ethnic and/or religious factors.

Other factors to consider are things such as pre-existing medical conditions that may place people at risk; or physical disabilities/limitations that may place them at risk. Some people may not be able to communicate with staff when they are having difficulty managing their own behavior, and the question to ask ahead of time is "what can staff do at these moments to help people feel safe and supported?"

---

We highly recommend demonstrating the two types of physical restraint taught by The Mandt System® to people as part of the "de-escalation preference tool" process. There are several reasons for this recommendation: **(1)** Based on abuse history and gender, some people may prefer one restraint over another. **(2)** If people are aware of how they will be restrained, and give informed consent (or their guardian gives this), then any retraumatization may be minimized.

**Again, we want to thank Kevin Ann Huckshorn and the National Technical Assistance Center for allowing us to utilize their material in this section.**

## Secondary Trauma

When staff use restraint, in whatever setting, the staff themselves may be traumatized. Secondary trauma refers to "professional workers' sub-clinical or clinical symptoms of PTSD that mirror those experienced by trauma clients, friends, or family members." (NCPTSD fact sheet) Secondary trauma is also known as vicarious Traumatization (Pearlman & Saakvitne, 1995) and compassion fatigue (Figley, 1995).

Some people who work with trauma victims become outwardly calloused and distant, while others use humor to deal with the feelings inside of them. All staff start out wanting to do their best, but over time can get to the point where they give less than their best because of the effects of secondary trauma. In many workplaces, there are Employee Assistance Plans to provide staff with support in the event they are traumatized in the course of their work.

Imposing restraint on people with whom staff have relationships can be difficult, especially in cases where injuries take place, and always when death occurs. Over time, the trauma can become overwhelming for staff, which is when they need the most support.

## Putting It All Together

The use of any restraint (manual, physical, mechanical, or chemical) or seclusion must be seen not as part of a treatment plan but rather as a safety response. The National Association of State Mental Health Program Directors has stated that seclusion and restraint are indicative of treatment failure, not treatment.

NOTES:

# Resilience

Not all the people who experience interpersonal violence develop symptoms of Borderline Personality Disorder, Post Traumatic Stress Disorder, Partial Complex Seizure Disorder, etc. The term used to describe people who have these experiences and do not experience long term responses associated with trauma is *resilience.* "Resilience refers to the child's ongoing efforts to tolerate, manage, and alleviate the psychological, behavioral, physiological, and social consequences of traumatic experiences. Effective adjustment includes no major deviation in the course of development and no long-term stress-related pathology" (Pynoos et al., 1995)

Some of the factors that may determine resiliency are:

- Family factors
    - Positive attachment to caregivers
    - Connections to other emotionally supportive adults
- Individual factors
    - Easy-going temperament
    - Internal locus of control
    - Positive coping strategies
    - Spirituality
        - ➢ (Werner & Smith, 1992)
- Community factors
    - Socio-Economic Status resources
    - Positive community organizations
    - Positive experiences with judicial system
        - ➢ (Masten & Coatsworth, 1998)

In a national analysis of how children can best be helped to recover from traumatic events, the development of healthy relationships was found to not only help the child socially and emotionally, but also to put them back on track for normal neurodevelopment. (Caldwell, 2005, Phelps, 2005). We can not stress enough the importance of healthy relationships between staff, as this serves as the context for services and provides a feeling of safety for the individual. Chapter 1 of The Mandt System® is the most important chapter that we teach!

# Conclusion

Before proceeding to the next chapter, review the learning objectives found at the beginning of this chapter. Do you feel that you have accomplished each of the objectives listed there? If not, mark the objective(s) that you feel uncertain about and review the section of the lesson that corresponds to that objective. When finished, review the terms listed in the glossary and proceed to the Group Review and Discussion questions found at the end of this chapter. These questions form an excellent summary of the concepts presented in the chapter. You should be able to interact on each of the questions found there. Since the chapters build upon one another, it is essential that you feel you have mastered the concepts and skills presented in this chapter before proceeding to the next.

Congratulations! You are at the end of this chapter, but there is certainly much more to learn on this topic. Our intent was to give you a brief overview of the topic of Trauma Support Services. Remember that it is your behavior as a staff person that will decide if situations are escalated or de-escalated, and people built up or torn down. Choose your behavior wisely!

Remember, one of the most important goals you can strive for in your job, home, or community is to develop a relationship with people, meet their needs, treat them with dignity and respect, as well as helping them keep their own dignity and respect for themselves.

A brief list of available resources on this subject follows:

http://www.thecommunitycircle.org        http://www.NCPTSD.org

http://www.TraumaCenter.org              http://www.nasmhpd.org

http://www.dhfs.state.wi.us/aging/dementia/appendixK.pdf

http://www.nctsnet.org/nccts/nav.do?pid=hom_main

[2]
All statistics cited can be found in *The Damaging Consequences of Violence and Trauma*, compiled by Ann Jennings, Ph.D. NTAC: 2004 and the NASMHPD Curriculum: *Six Core Strategies for the Reduction of Seclusion and Restraint*©, 2004.

# Glossary of Terms

**Acute Episodic Trauma** - a traumatic event that occurs to individuals over which they have no control, and is often, though not always, the result of natural disasters.

**Adverse Childhood Experiences (ACE's)** - growing up (prior to age 18) in a household with one or more of the following:   Recurrent physical abuse, recurrent emotional abuse, sexual abuse, An alcohol or drug abuser in the household, an incarcerated household member, someone who is chronically depressed, suicidal, institutionalized or mentally ill; mother being treated violently, one or no biological parents, emotional or physical neglect.

**Comprehensive Acute Traumatic Stress Management** – a specific method of providing services and supports to people who have experienced some sort of trauma; designed by the American Academy of Experts in Traumatic Stress (AAETS)

**Resilience** - Resilience refers to the child's ongoing efforts to tolerate, manage, and alleviate the psychological, behavioral, physiological, and social consequences of traumatic experiences. Effective adjustment includes no major deviation in the course of development and no long-term stress-related pathology

**Trauma from interpersonal violence** - "the personal experience of interpersonal violence including sexual abuse, physical abuse, severe neglect, loss, and the witnessing of violence."

**Trauma Informed Care** – care that is grounded in and directed by a thorough understanding of the neurological, biological, psychological, and social effects of trauma and violence on humans and is informed by knowledge of the prevalence of these experiences in persons who receive mental health services.

**Trauma Informed Services** - incorporates knowledge about trauma, prevalence, impact, and recovery in all aspects of service delivery. Minimizes revictimization and leads to services that are hospitable and engaging to survivors

**Trauma Specific Services** - promising and evidenced based best practices and services that directly address an individual's traumatic experiences and sequalae and that facilitate effective recovery for trauma survivors

# Self Study Questions

These self-study questions are provided to give you an opportunity to gauge your understanding of this chapter. Some or all of these questions will be used on the final exam.

**Please Circle T for True or F for False:**

1.  T or F    Most people have been affected by some sort of episodic trauma. (116)

2.  T or F    Traumatic experiences have no long-lasting effects. (121)

3.  T or F    People who experience four or more Adverse Childhood Experiences are at increased risk for I.V. drug abuse, alcohol abuse, and suicide attempts. (121)

4.  T or F    Many studies have found a high correlation between the diagnosis of Borderline Personality Disorder and traumatic abuse in women. (124)

5.  T or F    The use of any restraint (manual, physical, mechanical, or chemical) or seclusion must be seen not as part of a treatment plan but rather as a safety response. (128)

**Please Circle the Correct Answer:**

6.  Responses to traumatic events are often: (113)

    a)    highly inappropriate

    b)    normal responses to abnormal events

    c)    abnormal responses to normal events

    d)    identical from one person to the next in all cases

7.  Training in this chapter: (113)

    a)    will give non-licensed staff the ability to be therapists and counselors

    b)    is irrelevant to people who have experienced traumatic events

    c)    incorporates knowledge about trauma, prevalence, impact, and recovery in all aspects of service delivery

8.  The two types of trauma discussed in this chapter are: (113)

Acute _____ Trauma and Trauma from _____ _____

9.  The American Academy of Experts in Traumatic Stress (AAETS) uses a three-pronged strategy to respond to stress. The three prongs are: (116)

_____  _____  _____

## *References*

Child Welfare League of America (2004), Residential Group Care Quarterly, Vol. 5, No. 2, Fall 2004, page 14.

Fallot, Roger, (2005, March). A trauma-informed approach to community-based services. Paper presented at the 7th All-Ohio Institute on Community Psychiatry "Beyond evidence: trauma, treatment, resiliency and recovery, Cleveland, Ohio.

Lerner, Mark D, Shelton, Raymond D., (2005), Comprehensive Acute Traumatic Stress Management, American Academy of Experts in Traumatic Stress, Comack, NY 11725.

NASMHPD (National Association of State Mental Health Program Directors) (2005), NASMHPD Position Statement on Services and Supports to Trauma Survivors.

Phelps, June (2005), e-mail communication.

# LINCOLN REGIONAL CENTER

**Policy RI-38(LRC)**

Administrative Policies and Procedures

| | | | |
|---|---|---|---|
| Original Effective Date: | September 2003 | Position Accountable: | Clinical Director |
| Latest Review Date: | | Approved By: | _____<br>Barbara Ramsey, Ph.D., CEO |
| LATEST REVISION DATE: | | *(Original signed policy on file in LRC Administration.)* | |

# LINCOLN REGIONAL CENTER CONSUMER INVOLVEMENT

## PURPOSE:

The Lincoln Regional Center will establish and maintain a Consumer Advocacy Team for the primary purpose of observing quality-of-life conditions for patients at the facility.

## POLICY:

The team will conduct visits to the facility at least four times per year. The consumer Advocacy Team shall consist entirely of extramural members with primary consumers and family members, guardians, or persons bearing a similar relationship to current or past patients at a regional center. A primary consumer is defined as any adult who has received inpatient psychiatric treatment, preferably at a State operated facility.

## PROCEDURE:

The Lincoln Regional Center shall develop a list of prospective members for its Consumer Advocacy Team and submit it to the Chief Executive Officer for final approval before appointing the members to the Team. The list submitted for approval shall include the name, address, phone number, and brief autobiographical sketch of each prospective member.

In developing policies and procedures to establish and maintain a Consumer Advocacy Team, the facility must address the following:

A. Lincoln Regional Center Roles and Responsibilities:

- Mechanisms for recruiting and appointing extramural members, including primary consumers and other persons vis-à-vis other advocacy groups.

- Staff available to accompany or provide information to team members during visits.

- Provision of Department training / information for staff regarding their interrelationship with the Consumer Advocacy Team.

- Procedures, with timelines, for the CEO to receive and respond to reports of findings and conclusions of team visits.

6

# LRC CONSUMER INVOLVEMENT

# Policy <u>RI-38(LRC)</u>

- Provision of copies of the team's reports and the regional center's responses to HHSS.

- Hospital Administration's commitment to ongoing support and training of team members using developed training materials.

B.    Consumer Advocate Team Roles and Responsibilities:

- Basic process for on-site facility visits, minimum of 2 members and a maximum of 4 conduct on-ward visits.

- Sign an agreement regarding confidentiality and commitment to the role.